UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA A. SHENK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>– v. –<br><br>MALLINCKRODT PLC and MARK TRUDEAU,<br><br>Defendants. | No. 1:17-cv-00145-EGS |

(additional case captions continued on following page)

**AMALGAMATED BANK'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE COMPETING MOVANTS AND IN FURTHER SUPPORT OF ITS MOTION FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF ITS SELECTION OF LEAD COUNSEL**

| | |
|---|---|
| JYOTINDRA PATEL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>- v. –<br><br>MALLINCKRODT PLC and MARK TRUDEAU,<br><br>Defendants. | No. 1:17-cv-00171-EGS |
| AMY T. SCHWARTZ & STEPHEN A. SCHWARTZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>- v. –<br><br>MALLINCKRODT PLC and MARK TRUDEAU,<br><br>Defendants. | No. 1:17-cv-00447-EGS |
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>- v. –<br><br>MALLINCKRODT PLC, MARK TRUDEAU, and MATTHEW K. HARBAUGH<br><br>Defendants. | No. 1:17-cv-00534-EGS |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... v

I. PRELIMINARY STATEMENT ..... 1

II. THE PUBLIC RECORD ESTABLISHES THAT BARRACK RODOS AND MMMB HAVE MADE EXTENSIVE POLITICAL CONTRIBUTIONS TO DEWINE ..... 4

A. DeWine Has Final Authority Over STRS, Raising Questions About The Political Contributions By Proposed Counsel ..... 5

B. MMMB And Barrack Rodos Made Extensive Direct And Indirect Political Contributions To DeWine ..... 6

1. Direct Political Donations To DeWine And His Family ..... 6

2. Donations To Political Party Organizations That Supported DeWine's Election Campaigns ..... 8

C. MMMB Partner Hadden Raised Millions As DeWine's Campaign Treasurer ..... 8

D. Barrack Rodos Employs A Lobbyist In Ohio With Extensive Connections To DeWine, And Who Has Made Considerable Donations ..... 10

E. DeWine's Appointment Of Law Firms Which Have Made Political Contributions Has Received Widespread Scrutiny ..... 11

III. STRS IS INADEQUATE TO SERVE AS LEAD PLAINTIFF ..... 13

A. At This Stage Of The Litigation, The Court Must Satisfy Itself That The Lead Plaintiff And Proposed Lead Counsel Will Not Prejudice The Class By Subjecting It To The Unnecessary Expense, Delay, And Uncertainty Of Litigating Unique Issues ..... 13

B. The Intricate Web Of Connections Between STRS's Counsel And DeWine, And The Refusal To Explain Those Connections, Disqualifies STRS From Serving As Lead Plaintiff ..... 17

C. The Vast Record Of Political Contributions By Proposed Counsel To DeWine Would Saddle The Class with Unnecessary Burdens And Risks That Render STRS Inadequate ..... 21

D. In The Alternative, Amalgamated Has Established A "Reasonable Basis" To Conduct Discovery Into STRS's Adequacy As Lead Plaintiff ..... 23

IV. AMALGAMATED SHOULD BE APOINTED LEAD PLAINTIFF AND BFA SHOULD BE APPOINTED LEAD COUNSEL ........ 24

V. CONCLUSION ........ 25

## TABLE OF AUTHORITIES

### CASES

*Andrade v. American Apparel, Inc.*, CV 10-06352, 2011 WL 1313110 (C.D. Cal. Jan. 21, 2011) .......... 24

*Beck v. Maximus, Inc.,* 457 F.3d 291 (3d Cir. 2006) .......... 2

*Eichenholtz v. Verifone Holdings, Inc.*, No. C07–06140MHP, 2008 WL 3925289 (N.D. Cal. Aug. 22, 2008) .......... 13

*Hanon v. Dataproducts Corp*., 976 F.2d 497 (9th Cir. 1992) .......... 2

*In re Bank of N.Y. Mellon Corp. Forex Litig*., 148 F. Supp. 3d 303 (S.D.N.Y. 2015) .......... 3, 14, 17

*In re Cendant Corp. Litig.* 264 F.3d 201 (3d Cir. 2001) .......... 14

*In re Cendant Corp. Litig*., 182 F.R.D. 144 (D.N.J. 1998) .......... 15

*In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240 (N.D. Cal. 2013) .......... 13, 14, 15, 17

*In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104 (D. Ill. 1996) .......... 16

*In re Imax Sec. Litig.*, 272 F.R.D. 138 (S.D.N.Y. 2010) .......... 15, 16

*In re Netflix, Inc. Sec. Litig.*, No. 12-0225, 2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) .......... 2, 16

*In re Network Assoc., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017 (N.D. Cal. 1999) .......... 5

*In re Petrobras Sec. Litig*., 104 F. Supp. 3d 618 (S.D.N.Y. 2015) .......... 18

*Kayes v. Pac. Lumber Co*., 51 F.3d 1449 (9th Cir. 1995) .......... 6

*Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tex. 2002) .......... 5

*Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2011) .......... 17

*Schriver v. Impac Mortg. Holdings, Inc*., No. SACV 06-31, 2006 WL 6886020 (C.D. Cal. May 2, 2006) .......... 18

*Steamfitters Local 449 v. Cent. European Distrib. Corp*., No. 11-6247, 2012 WL 3638629 (D.N.J. Aug. 22, 2012) .......... 4, 16

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) .......... 17

*Yamada v. Weaver*, 872 F. Supp.2d 1023 (D. Haw. 2012) .......... 17

**STATUTES**

15 U.S.C. § 78u-4 .................................................. 1, 23

OHIO REV. CODE § 3517.13(I) .................................................. 6

**RULES**

Fed. R. Civ. P. 23 .................................................. 1, 14

## I. PRELIMINARY STATEMENT

There are effectively two movants for Lead Plaintiff remaining: Amalgamated Bank ("Amalgamated") and the State Teachers Retirement System of Ohio ("STRS"). The issue before the Court is whether the substantial political contributions made by STRS's proposed counsel for the Class to the Attorney General of Ohio, R. Michael DeWine ("DeWine"), rebuts the presumption that STRS is "the most adequate plaintiff," which is the required standard under the PSLRA to be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B).

Amalgamated raises this issue at the lead plaintiff stage so that it can be aired ***before*** the Class invests time and resources into a case led by a class representative and its counsel who have a disqualifying financial relationship outside of the instant retention. For this reason, Amalgamated filed its opposition four days early, identifying certain political contributions and requesting that STRS fully disclose all contributions related to its proposed counsel.

STRS declined to disclose any additional contributions in its reply brief (ECF 28), beyond those previously identified by Amalgamated in its opposition (ECF 27). It further took the position that even though two law firms are representing it, STRS need only address the contributions made by Barrack Rodos & Bacine ("Barrack Rodos") which STRS designated as "lead counsel," but not the contributions made by the firm it describes as "special counsel," Murray Murphy Moul + Basil LLP ("MMMB"). STRS made the remarkable (yet legally unsupportable) assertion that a firm designated as "special counsel" is not subject to judicial approval (ECF 28, n.4), ignoring that Fed. R. Civ. P. 23(g) sets forth specific requirements that this Court "must consider" in appointing class counsel, and that ultimately the Class will pay MMMB's legal fees.

Despite STRS's refusal to disclose any additional contributions, the public record strongly suggests that Defendants will aggressively challenge whether proposed counsel for STRS were selected not on their merits alone, but based on those contributions. As documented in detail

below, proposed counsel for STRS and their lobbyist have donated hundreds of thousands of dollars to DeWine and the Ohio Republican Party (the "Ohio GOP"), which in turn has contributed $3.9 million dollars to DeWine.

Particularly conspicuous is STRS's selection of MMMB as "special counsel." STRS provides no reason justifying a second law firm with the obvious duplication and inefficiencies that that entails. Importantly, DeWine's former campaign Treasurer is now a partner at MMMB and made a political contribution to DeWine's campaign fund five days after this case first broke.

While it refuses to address the contributions and political donations of MMMB, and that Barack Rodos has employed a political lobbyist in Ohio for years, STRS argues that the two donations by Barrack Rodos specified in Amalgamated's opposition brief do not "prove" that pay-to-play actually occurred – that AG DeWine selected counsel here based on political donations rather than merit. But the significant donations by both firms, and other unusual connections discussed below, invite the inquiry. As the *Netflix* court noted in weighing the issue of a movant's adequacy at the lead plaintiff stage, "[t]he point of this requirement is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole'" *In re Netflix, Inc. Sec. Litig.*, No. 12-0225, 2012 WL 1496171, at *5 (N.D. Cal. Apr. 27, 2012) (citing *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992)). "There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial." *Id.* (citing *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006)).

In asking the Court to ignore the issue, STRS misconstrues the Court's role at the lead plaintiff stage – which is to protect the class from unnecessary expense and distraction – and suggests that STRS is not impartial on the issue of whether or not it would be more expedient to

appoint a lead plaintiff not tainted with these issues. Put simply, this Court is asked to determine whether this unparalleled record that strongly suggests that Defendants will question whether class counsel was selected as a result of political contributions is sufficient to rebut the presumption of adequacy at the lead plaintiff stage. Amalgamated believes that on this record, this Court should so find. *In re Bank of N.Y. Mellon Corp. Forex Litig.*, 148 F. Supp. 3d 303, 307-08 (S.D.N.Y. 2015) (noting that retention of counsel who "pa[id] to play" would indicate a conflict between the class and its lawyers and putative representative, and that "even the appearance of such arrangements threatens to sap the legitimacy of the selection").

If the Court were not to address this issue now, the financial relationship between proposed class plaintiff and its counsel would continue to impact the case. Defendants will probe this question at class certification when they inevitably seek to disqualify STRS as an inadequate class representative. And even if the Class is certified, these political contributions will be fair game at trial, undermining STRS's credibility. The financial relationship between proposed class plaintiff and its counsel create a latent tension from the outset. In addition, the timing and amount of any settlement could be called into question, particularly if it could be perceived as timed to forestall discovery and disclosure of such arrangements and relationships. Whether it manifests as delay and disruption, unnecessary fees and expenses, or a suboptimal result, the Class will foot the bill for defending DeWine from claims it hired class counsel in exchange for financial support.

Importantly, although this financial relationship will continue to plague this case, the <u>only</u> opportunity for a Class member such as Amalgamated to raise the concerns over who represents the Class is at the lead plaintiff motion stage. At class certification, when significant case costs and litigation strategies will already have been incurred or be in process, Defendants play that role, and at settlement absent class members can only object to the settlement or opt out to bring their

own claims. For this reason, at the Lead Plaintiff stage "[t]he Court must ensure that the lead plaintiff will not prejudice the class by subjecting the class to the delay, expense, and uncertainty of litigating unique defenses" and similar attacks that will be unnecessarily injected into the case if STRS is appointed. *Steamfitters Local 449 v. Cent. European Distrib. Corp.*, No. 11-6247, 2012 WL 3638629, at *13 (D.N.J. Aug. 22, 2012).

In contrast to STRS, no concerns have been raised about Amalgamated or its selection of counsel. There are none. Amalgamated has a long and successful track record as lead plaintiff, takes its fiduciary responsibilities seriously, and obtains stellar results. (*See* ECF 12, (Meeks Decl.) Ex. D, at ¶¶5-8). Its choice of counsel was based on merit and an arms' length selection process. Because Amalgamated has the next largest loss, and it is adequate and typical, the Court should appoint Amalgamated Lead Plaintiff and approve of its selection of BFA as Lead Counsel.[1]

## II. THE PUBLIC RECORD ESTABLISHES THAT BARRACK RODOS AND MMMB HAVE MADE EXTENSIVE POLITICAL CONTRIBUTIONS TO DEWINE

DeWine's proclivity for hiring counsel who have donated to his campaign has become a matter of public concern and debate. A 2014 article in the *Dayton Daily News*, titled, "Firms Gave Heavily to DeWine,"[2] suggested that DeWine's panel of securities law firms was not impartially selected.[3] An "examination [by the *Daily News*] found huge campaign contributions from some of the members of the panel, including some that came as DeWine was deliberating on which firms

[1] Amalgamated's Reply Memorandum of Points and Authorities, filed April 17, is timely pursuant to D.D.C. L. Civ. R. 7(d), as it is filed "[w]ithin seven days after service" of STRS's opposition to Amalgamated's Motion, filed April 10.

[2] 2d Meeks Decl. Ex. A (DAYTON DAILY NEWS, *Firms gave heavily to DeWine, GOP* (Jan. 26, 2014)).

[3] "Panel" refers to the 29 law firms pre-approved by DeWine, from which DeWine then chooses to appoint on a case-by-case basis. (ECF 25-1, (Fonti Decl.) Ex A ("Request for Qualifications for Special Counsel for Securities Fraud: National Counsel & Ohio Counsel," issued by DeWine on January 8, 2016)).

to put on the panel." In contrast, "the 16 firms that did not land spots on the panel were not big campaign contributors."[4] James Copland of the "conservative-leaning Manhattan Institute of Policy Research" studied the pay-to-play issue, and concluded: "It appears based on the timing on where some of this money has come in, there's a rather overt effort to correlate contributions to DeWine's campaign fund with the selection of these firms to get on the (advisory) panel."[5]

### A. DeWine Has Final Authority Over STRS, Raising Questions About The Political Contributions By Proposed Counsel

The political contributions here are problematic because DeWine has absolute control of STRS in connection with its proposed role as Lead Plaintiff in this case.[6] Securities cases are run by the Attorney General's office, and not STRS.[7] DeWine is therefore not acting merely as counsel in this case, but as the decision-maker for STRS. In effect, DeWine is the proposed Lead Plaintiff.

In this role, DeWine "owes a fiduciary duty to all members of the proposed class to provide fair and adequate representation and actively to work with class counsel to obtain the largest recovery for the proposed class consistent with good faith and meritorious advocacy." *In re Network Assoc., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1032 (N.D. Cal. 1999). DeWine and counsel "must act with unwavering and complete loyalty to the class members they represent," such that "the 'responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.'" *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 589 (W.D. Tex. 2002) (*citing Kayes v. Pac. Lumber Co.*, 51

---

[4] *Id.*

[5] *Id.*

[6] DeWine was elected as Attorney General in 2010 and re-elected in 2014. DeWine has announced his intention to run for Governor in 2018 and raised over $2.5 million. *See* 2d Meeks Decl. Ex. B (Henry J. Gomez, *Mike DeWine and Jon Husted tie for fundraising lead as race for Ohio governor enters early phase*, CLEVELAND.COM (Jan. 31, 2017)).

[7] *See* ECF 25-1 (Fonti Decl.) Ex A, at 2.

F.3d 1449, 1465 (9th Cir. 1995)). For these reasons, even the appearance of a conflict between DeWine and the counsel he appointed on the one hand, and the Class on the other, would disqualify STRS at class certification.[8]

### B. MMMB And Barrack Rodos Made Extensive Direct And Indirect Political Contributions To DeWine

#### 1. Direct Political Donations To DeWine And His Family

Based on public information on the Ohio Secretary of State database,[9] attorneys at MMMB and Barrack Rodos have contributed $28,432 directly to DeWine's election campaigns since 2011, and $9,750 to the election campaigns of DeWine's son, the Honorable Richard Patrick "Pat" DeWine,[10] as set forth below, with nearly all individuals giving the maximum amount permissible:[11]

- June 30, 2011, MMMB partners Joseph Murray ("Murray"), Brian Murphy ("Murphy"), Geoff Moul ("Moul"), and Brian Basil ("Basil"), along with immediate family members, each made donations ranging from $200 to $1,000 to DeWine, for a total of $7,200; on this same day, MMMB attorneys Hadden and Daniel Massey ("Massey") contributed a total of $732 to DeWine.[12]

---

[8] Other states permit state pension funds to retain their own counsel. For example, the major funds in California and the New York State funds have their own RFP and selection process. The Attorneys General of those states do not control the retention and selection process.

[9] The information referenced in this brief is only that which is publicly available. The class cannot be assured that it is aware of all direct and indirect political contributions unless STRS's counsel and DeWine make those disclosures. Printouts of the search results showing each of the listed political donations referenced in § II. B. 1. are included as Exhibit C to the 2d Meeks Decl.

[10] Pat DeWine was elected to the Ohio 1st District Court of Appeals in November 2012 and elected to the Ohio Supreme Court in November 2016.

[11] MMMB attorneys appear to have maxed-out their direct contributions to DeWine in view of Ohio's limit of $1,000 in donations for every two calendar years for individuals (and their spouses and associates) who seek no-bid contracts from an elected official, such as the contract for appointment as counsel in this case. *See* OHIO REV. CODE § 3517.13(I).

[12] According to court filings, at the time, Hadden and Massey were with the law firm of Porter Wright Morris & Arthur. Hadden appears to have joined MMMB in 2014.

- November 29, 2011, current MMMB attorney Massey contributed $500 to DeWine.

- March 22, 2012, MMMB donated $1,150 to Judge DeWine's campaign for election to Ohio's First District Court of Appeals.

- June 14, 2012, MMMB, Murphy, and Basil donated, $2,300, $1,150, and $550, respectively, to Judge DeWine's election for a total of $4,000.

- July 24, 2012, Hadden and Massey contributed a total of $768 to DeWine.

- October 23, 2012, an immediate family member of Hadden donated $1,000 to Judge DeWine's election campaign.

- July 13, 2013, the Political Action Committee of Barrack Rodos donated $4,000 to DeWine. Barrack Rodos is based in Pennsylvania and this is the only political contribution by this PAC to a non-Pennsylvania candidate other than Hillary Clinton.[13]

- May 31, 2013, Murray, Murphy, Moul, and Basil, along with a John Murphy listing MMMB as his employer, and immediate family members, each donated $1,000 to DeWine, for a total of $10,000; on this same day Hadden and Massey contributed a total of $1,232.

- July 29, 2015, Basil and an immediate family member each donated $1,000 to DeWine for Ohio, for a total of $2,000.

- On December 18, 2015, MMMB donated $3,600 to the campaign of Judge DeWine for election to the Ohio Supreme Court (the highest court in the state).

- January 28, 2017, Hadden and an immediate family member each donated $1,000 to DeWine for Ohio, for a total of $2,000. The initial Complaint in the first of the above-captioned cases was filed five days prior to these donations. (*See* ECF 1).

---

[13] Public sources indicate that this PAC has only donated to five political campaigns since 2011, all at the Federal government level: Hillary Clinton ($2,700 in 2015); U.S. Rep. Bob Brady (D-Pa.) ($5,000 in each of 2014, 2015, and 2016); U.S. Rep. Allyson Schwartz (D-Pa.) ($1,000 in 2012); and the ultimately-unsuccessful congressional candidate Daylin Leach (D-Pa.) ($250 in 2013). *See reports available at* FEDERAL ELECTION COMMISSION, *Reports Image Index for [Barrack, Rodos & Bacine Political Action Committee]*, http://docquery.fec.gov/cgi-bin/fecimg/?C00258590 (last visited Apr. 17, 2017).

### 2. Donations To Political Party Organizations That Supported DeWine's Election Campaigns

According to the *Cincinnati Enquirer*, law firms were selected as securities counsel after making substantial donations to the Ohio GOP, which the *Enquirer* noted is a common means by which counsel have circumvented the state's restrictions on campaign donations to individual candidates.[14] Here, Barack Rodos, MMMB and their associates have made political contributions totaling $64,500 to the Ohio GOP since 2011, as follows:

- October 12, 2011, Hadden gave $20,000.
- December 5, 2012, Barrack Rodos gave $30,000.
- September 25, 2013, Hadden gave $5,000.
- March 3, 2016, Hadden gave $9,500.

In turn, the Ohio GOP has given substantial funds to DeWine, approximately *$3.9 million* between 2011 and 2016: $778,817 in 2011; $101,953 in 2012; $265,161 in 2013; $1,737,767 in 2014; $445,761 in 2015; and $612,389 in 2016.[15]

## C. MMMB Partner Hadden Raised Millions As DeWine's Campaign Treasurer

Hadden, who is currently a partner at MMMB, served as Treasurer for DeWine's election campaigns from 2009 through at least DeWine's reelection in 2014.[16] As Treasurer, Hadden raised

---

[14] *See, e.g.*, 2d Meeks Decl. Ex. D (Julie Carr Smyth (AP), *DeWine's vetting of law firms undocumented*, CINCINNATI ENQUIRER (June 26, 2014)) (describing how "[f]irms can circumvent" the $1,000 cap on donations to a candidate in an Attorney General election "by donating" to the Ohio GOP, and providing examples of donations by law firms seeking to be selected for the state's securities fraud litigation panel who made substantial donations, such as "Dayton-based Dyer, Garafolo, Mann & Schultz [which] was rejected in 2011, then submitted virtually the same application a year later after donating $25,000 to the Ohio Republican Party and was picked," and another New York city based firm "donated $50,000 to the party" after being selected for the securities fraud litigation panel in 2012).

[15] Support for the above-listed citations can be found at 2d Meeks Decl. Ex. E.

[16] *See* 2d Meeks Decl. Ex. F (William Hershey, *Mike DeWine considers AG race - decision soon*, DAYTON DAILY NEWS (June 12, 2009)) ("DeWine on Thursday designated a treasurer - J. Hadden

hundreds of thousands of dollars and helped organize a number of fund raisers for DeWine. For example, in 2013, Hadden co-hosted a $500 per-person fundraiser held at a minor league baseball stadium.[17] In 2014, Hadden paid for a fund raising reception for Mike DeWine at a meeting in Washington, D.C. of the Republican Attorneys General Association's, a group created to raise funds for the campaigns of Republican Attorneys General, for which sponsors paid as much as $5,000 per person.[18] Hadden also paid for a September 2014 reception at a private home to raise money for DeWine which cost as much as $5,000 to "Co-Chair" and $250 per person to attend.[19]

Significantly, a substantial portion of the funds raised by Hadden were used to pay back $2 million in personal loans that DeWine had made to his campaigns; in effect Hadden was raising public money to pay DeWine.[20] Commentators have noted that this was an unusual step, as candidates often forgive such loans.[21]

---

- for a state campaign fund."); *id.* Ex. G (DELAWARE COUNTY [OHIO] REPUBLICAN PARTY, *Invitation to Sept. 15, 2014 Fundraiser for Mike DeWine*) (listing "JB Hadden" as Treasurer).

[17] 2d Meeks Decl. Ex. H (Laura A. Bischoff, *Vendors gave big to DeWine, GOP*, DAYTON DAILY NEWS (July 20, 2014)).

[18] *See* 2d Meeks Decl. Ex. I (MIKE DEWINE FOR OHIO, *Invitation to February 24, 2014 Fundraiser for Ohio Attorney General Mike DeWine*.)

[19] 2d Meeks Dec. Ex. G (DELAWARE CO. REPUBLICAN PARTY, *Invitation…*) *supra* n. 16.

[20] 2d Meeks Decl. Ex. A (DAYTON DAILY NEWS, *Firms gave heavily to DeWine, GOP*), *supra* n.2, ("In the three years since winning a close race for attorney general, Mike DeWine and his political team have been raising hundreds of thousands of dollars – often from lawyers who want state business — and then using that campaign cash to pay off a $2 million personal loan that DeWine made to his committee in 2010 and to build up a war chest for his 2014 re-election bid.").

[21] *Id.* ("DeWine is in an unusual situation because he loaned his campaign an unprecedented $2 million in his 2010 bid to oust [his predecessor]. Often candidates — including [DeWine's 2014 opponent] — have forgiven personal loans to their campaigns. DeWine did not.").

### D. Barrack Rodos Employs A Lobbyist In Ohio With Extensive Connections To DeWine, And Who Has Made Considerable Donations

Barrack Rodos has employed a lobbyist in Ohio named Stephanie McCloud ("McCloud") since at least April 2011, according to the public database of Ohio's Office of the Legislative Inspector General.[22] She is Barrack Rodos's sole lobbyist in Ohio, and the law firm is one of only two lobbying clients listed by McCloud.[23] McCloud has deep roots with the Ohio GOP[24] and DeWine, reportedly having worked on his transition team in 2010 after his first election victory.

Further, McCloud is currently appointed by DeWine as "special counsel" for debt collection on behalf of Ohio.[25] Since 2012, McCloud and an immediate family member have given $119,150 to the Ohio GOP, $4,750 to Judge DeWine, and $3,850 directly to DeWine, as follows:

- July 6, 2012, McCloud donated $2,500 to Mike DeWine for Ohio. On July 24, 2012 McCloud donated an additional $350.
- August 17, 2012 McCloud's husband donated $1,000 to Mike DeWine for Ohio.
- On October 2, 2012, McCloud's husband donated $1,000 to the Ohio GOP.
- On October 20 and 23, 2012, the McClouds each donated $1,000 to Judge DeWine's campaign for a total of $2,000.

---

[22] OHIO OFFICE OF THE LEGISLATIVE INSPECTOR GENERAL, Active Agents and Employers by Date, http://www2.jlec-olig.state.oh.us/olac/Reports/ActivityByDate.aspx (last queried Apr. 17, 2017).

[23] 2d Meeks Decl. Ex. J (screen shot of search of Ohio Legislative Inspector General's database).

[24] McCloud's name was floated as a possible Republican candidate for Attorney General in 2008. She had experience working in the AG's office and as deputy legal counsel for former Ohio Governor George Voinovich. 2d Meeks Decl. Ex. K (Julie Carr Smyth, *GOP Considers Daughter of Christian Activist,* ASSOCIATED PRESS (June 24, 2008)); 2d Meeks Decl. Ex. L (COLUMBUS DISPATCH, *Former Petro aide in GOP field for AG's race* (July 3, 2008)).

[25] *See* McCloud's law firm's debt collection website at http://mccloudlegal.com/. (Last visited Apr. 17, 2017). DeWine has been criticized for providing lucrative debt collection contracts to attorneys who gave substantial political donations. *See infra* at § II. E.

- Over the course of several days in 2013, the McClouds gave a total of $29,000 to the Ohio GOP ($12,000 from Stephanie and $17,000 from her husband).

- April 7, 2014, McCloud gave $10,000, and her husband gave $15,000, to the Ohio GOP. In 2014, McCloud gave an additional $1,000 on February 27, $1,000 on September 29, $500 on October 24 and $1,000 on December 19 to the Ohio GOP.

- February 4, 2015, McCloud gave $25,000 to the Ohio GOP. McCloud gave an additional $1,250 ($1,000 on June 2 and $250 on July 10), while her husband gave another $2,000 on October 19, 2015.

- December 18, 2015, McCloud's husband contributed $2,500 to Judge DeWine's campaign for Ohio's Supreme Court; McCloud contributed $250 to this campaign in 2016.

- January 8, 2016, McCloud gave $2,000 to the Ohio GOP.

- In 2016 McCloud gave $28,000 in additional donations to the Ohio GOP: on April 11 ($4,000) and 21 ($2,000), May 11 ($20,000), August 25 ($1,000), and December 14 ($500) and 15 ($500). Her husband gave an additional $3,000 in 2016 (August 25 ($1,000) and December 14 ($2,000)).[26]

**E. DeWine's Appointment Of Law Firms Which Have Made Political Contributions Has Received Widespread Scrutiny**

DeWine has recently faced intense public criticism for his appointment of counsel to lucrative work who donated to his political campaigns, particularly his former campaign treasurer Hadden who is now at MMMB. On June 3, 2014, the *News Herald* published a report by Julie Carr Smyth titled, *Ohio AG's $26M In Outside Lawyers Comes Under Fire* (attached as 2d Meeks Decl. Ex. N). It reported that DeWine had been criticized for alleged "pay to play" and cited an "August 2012 email in which DeWine appeared to direct his staff to give special counsel work to DeWine's campaign treasurer, Columbus attorney J.B. Hadden." According to the article:

> In the heavily redacted email string, Hadden expressed interest in working on a particular case. One of his emails was forwarded to DeWine's personal

[26] Support for the above-listed contributions is attached as 2d Meeks Decl. Ex. M.

> email address. DeWine sent it back to a team of top staffers with the note, "Please make this happen unless there's a reason not to."

Earlier that year, on January 26, 2014, the *Dayton Daily News* published an article titled *Firms gave heavily to DeWine, GOP* (attached as 2d Meeks Decl. Ex. A). The article noted that most of the law firms that DeWine assigned work "contributed via PACs or employees to the Ohio GOP, Mike DeWine and/or Pat DeWine — more than $1.3 million from 2010 to 2013." The article further quoted "University of Michigan law professor Adam Pritchard, considered an expert on pay-to-play in securities fraud cases," as concluding that "[t]he reason to have the panel is to get these people [lawyers] in the door so they can make campaign contributions. It gives them a tangible spot that they can see what they're getting for their campaign contributions."

Additional articles further documented the significant campaign contributions:

- Randy Ludlow, *Dewine Criticized On Legal Contracts*, COLUMBUS DISPATCH (May 27, 2014): "Ohio Attorney General Mike DeWine wants to hire 63 law firms at a cost of $26.4 million to represent state agencies and boards through mid-2015. A *Dispatch* analysis shows that lawyers from those firms have contributed at least $359,000 to DeWine since 2010 as the Republican seeks a second term this year. His opponent says it smacks of 'pay-to-play politics.'" 2d Meeks Decl. Ex. O.

- Julie Carr Smyth (AP), *DeWine's vetting of law firms undocumented*, CINCINNATI ENQUIRER (June 26, 2014): reported that DeWine's process for selecting and hiring outside law firms, including for securities fraud cases, was essentially undocumented. "DeWine's office can provide little written evidence that the selection committee completed its work. A public records request by the AP turned up no judges' notes, scoring sheets, email exchanges on firms' qualifications or recommendations made to DeWine." The article also reported that "[c]ampaign finance reports show special counsel contenders donating to the campaigns of DeWine, his son and the Ohio Republican Party, with the pace of donations rising when the selection process is underway." 2d Meeks Decl. Ex. D.

- Laura A. Bischoff, *Vendors Gave Big To DeWine,* DAYTON DAILY NEWS (July 20, 2014): reported on the link between campaign contributions to DeWine and the Ohio GOP and assignment of counsel to lucrative debt collection contracts. The "119 outside attorneys handling debt collection for DeWine, their firms and their close family members contributed $1.38 million to" DeWine, his son, and the Ohio GOP. 2d Meeks Decl. Ex. H.

- In one instance, a company formed "just two days before DeWine's office put out a request for proposals," and "without experience," won a lucrative contract over experienced firms after it "sent $1,150 to Pat DeWine's campaign and $35,000 to the Ohio Republican Party, plus $23,000 to the Summit County GOP, which has sent Mike DeWine's campaign $405,500 since 2010."

- David Yates, *Four More Years Of 'Pay-To-Play' If DeWine Returns As Ohio AG, Says Dem Challenger*, WASHINGTON EXAMINER (October 14, 2014): referenced articles reporting that firms selected by DeWine to serve on the securities litigation panel made political donations to his campaign in close temporal proximity to submitting their applications or being selected. 2d Meeks Decl. Ex. P.

## III. STRS IS INADEQUATE TO SERVE AS LEAD PLAINTIFF

### A. At This Stage Of The Litigation, The Court Must Satisfy Itself That The Lead Plaintiff And Proposed Lead Counsel Will Not Prejudice The Class By Subjecting It To The Unnecessary Expense, Delay, And Uncertainty Of Litigating Unique Issues

The adequacy inquiry at the lead plaintiff stage is designed to provide the Court the opportunity to protect the Class from unnecessary expense, risk, and distraction that could diminish or even preclude recovery later in the litigation. *Eichenholtz v. Verifone Holdings, Inc.*, No. C07–06140MHP, 2008 WL 3925289, at *10–11 (N.D. Cal. Aug. 22, 2008) (refusing to appoint group that included day trader whose presence might subject class to additional defenses). Indeed, this is the only opportunity for Class members to be heard with respect to Class leadership. Congress organized the process in this manner because, ultimately, it is the Class that will pay the bill for counsel and the litigation of extraneous issues, and whose recovery is at stake. *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 257 (N.D. Cal. 2013) ("We must never lose sight of the fact that in class actions, all of the absent class members' individual claims will be extinguished and replaced by whatever verdict or settlement class counsel obtain. Absent class members deserve and are entitled to the most adequate counsel available.").

In light of this, it is well established that "[t]he lead plaintiff has a fiduciary duty to the class to select appropriate counsel who will diligently represent the interests of the class, not those

of counsel, or of" the person or entity that appoints counsel. *Id*. at 256. The "PSLRA and Rule 23 insist that class counsel always be selected based on the best interest of the class rather than on counsel's political connections due to political or campaign contributions (or any other extraneous reason)." *Id.* at 256-57.

Political contributions implicate critical concerns relating to the adequacy of the lead plaintiff to "fairly and adequately protect the interests of the class." Rule 23(a)(4). As the Third Circuit stated in *In re Cendant Corp. Litig.*:

> The concern is that an *informal* quid pro quo could develop in which law firms specializing in securities class actions would contribute to the campaign coffers of the elected officials who oversee those funds, and that, in exchange (and in the hopes of getting more contributions), those officials would use their control over those funds to select those firms to serve as lead counsel for the cases in which the funds are lead plaintiff. . … Were such a scenario to occur, the elected official's conduct—besides representing a breach of fiduciary duty to the pensioners—would threaten the best interests of the class members. 264 F.3d 201, 270 n. 49 264 F.3d 201, 270 n. 49 (3d Cir. 2001) (emphasis supplied).

Thus, "district courts should be particularly attuned to the risk of pay-to-play." *Id.*[27] One underlying reason is that the Class "should … at least take comfort in the belief that class counsel were adequate to the challenge and should not have to worry that class counsel got the job as a reward for political campaign contributions." *Diamond Foods,* 295 F.R.D. at 257. "The PSLRA was not intended as a vehicle for keeping elected officials in office by allowing them to extract campaign contributions from lawyers selected to serve as class counsel." *Id.* at 256.

[27] *See also, In re Bank of N.Y. Mellon Corp. Forex Litig.*, 148 F. Supp. 3d 303, 307 (S.D.N.Y. 2015) ("Such arrangements suggest a conflict of interest on the part of a lead plaintiff between an official's interest in campaign contributions and its fiduciary duty to the class. Such a conflict could undermine the perhaps otherwise appropriate assumption that a lead plaintiff acts solely in the interests of the class in retaining and supporting fee applications by its chosen lead counsel.").

While STRS argues that in no case has a court directly disqualified a presumptive lead plaintiff based on play to pay allegations, no record such as this one has been before any determining court.[28] Here, the public record shows that proposed counsel has taken an active role in fundraising hundreds of thousands of dollars for the political candidate (and his party) who chooses the law firms awarded the contract to represent the state pension funds. Accordingly, Amalgamated invited STRS to make its own record on the issue. STRS declined to do so, other than confirming the transactions Amalgamated found in the public record about Barrack Rodos. (ECF 25). STRS asserts that the two donations are irrelevant because Amalgamated "has not carried its heavy burden of presenting proof, as required by the PSLRA, that BR&B's political contributions were the driving factor underlying STRS Ohio's selection of BR&B." (ECF 28, at 8). This misapprehends the law, the purpose of the lead plaintiff process, and the Court's role.

Amalgamated need not prove an informal quid pro quo – a difficult thing to prove in its own right – to raise legitimate concerns that STRS is not the most adequate plaintiff before the Court. The web of political contributions and the appearance of such an informal understanding between DeWine and his counsel is sufficient to rebut the presumption that STRS is the most adequate plaintiff. *In re Imax Sec. Litig.*, 272 F.R.D. 138, 157 (S.D.N.Y. 2010) ("the possibility

[28] In *Cendant*, the only other case of which Amalgamated is aware in which a movant challenged the influence of political donations on another movant's selection of counsel, the allegation was simply of unquantified "substantial" donations to an elected official with indirect "influence" over the movant. *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 148-49 (D.N.J. 1998). Here, extensive political contributions and participation in AG DeWine's campaign were for the direct benefit of the ultimate decision maker, AG DeWine. The Court opinion in *Diamond Foods*, to which STRS refers (ECF 28, at 6-7), also involved some unquantified political contributions, and was decided at the class certification stage, not the lead plaintiff stage, and thus engaged with the merits of the pay-for-play allegations, not whether, as is appropriate at the lead plaintiff stage, the class should bear the costs and risk of litigating the issue in the first instance. *Diamond Foods*, 295 F.R.D. 240. In *Meddof v. CVS Caremark Corp., et al*., No. 09-cv-00554 (D.R.I. Mar. 10, 2010) the appointment of lead plaintiff was undisputed.

of inadequacy and the appearance of impropriety are sufficient for us to deny certification of a class with Snow Capital as its representative"). In *Imax,* the appointed lead plaintiff did not disclose at the lead plaintiff stage the existence of additional counsel with whom it had a very close personal and business relationship. *Id.* at 156. When it was uncovered by defendants in discovery, the Court rejected the proposed representative and denied class certification. *Id.* at 157. *Imax* specified that while the appearance of impropriety did not establish the "reality" of impropriety, the appearance was sufficient to reject the proposed class representative: "We do not suggest that Snow Capital's representation would in fact be inadequate – but the possibility of inadequacy and the appearance of impropriety are sufficient." *Id. See also In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 109 (D. Ill. 1996) (finding the appearance of impropriety, even if no actual impropriety, sufficient to reject proposed class representative).

Moreover, at the lead plaintiff stage, disqualification of a movant does not require competing movants to "prove" that a unique characteristic of that movant, such as the political contributions at issue here, would disqualify the movant at class certification, or that the Court "adjudicate the case before it has even begun." *In re Netflix*, 2012 WL 1496171, at *5. Instead, "[t]he Court must ensure that the lead plaintiff will not prejudice the class by subjecting the class to the delay, expense, and uncertainty of litigating unique defenses," and similar attacks that will be unnecessarily injected into the case if a particular movant is appointed Lead Plaintiff. *Cent. European Distribution*, 2012 WL 3638629, at *13.

Indeed, given their importance, political donations require particular scrutiny, as "even the appearance of such arrangements threatens to sap the legitimacy of the selection and compensation

of lead counsel in PSLRA cases." *In re Bank of N.Y. Mellon,* 148 F. Supp. 3d at 307-08.[29] "Just as a lawyer or judge should not participate where there would be an appearance of impropriety, no one should take on the fiduciary responsibility of class counsel when it might reasonably appear that their selection was based on political campaign contributions rather than merit." *Diamond Foods*, 295 F.R.D. at 257.

In other words, all that is required to rebut the presumption as the most adequate plaintiff is "proof" that the appearance of an informal quid pro quo will leave the class vulnerable to unnecessary substantial risk and expense at later stages of litigation. Here, the political donations documented in public databases, as well as the press articles stating that there is an appearance of an informal quid pro quo, constitute proof. This proof is more than sufficient to establish that Defendants will likely pursue the issue vigorously, at significant expense to the Class.

### B. The Intricate Web Of Connections Between STRS's Counsel And DeWine, And The Refusal To Explain Those Connections, Disqualifies STRS From Serving As Lead Plaintiff

STRS argues that donations by counsel are legal. (ECF 28, at 12). This is true, if these are independent transactions, but the issue here is not whether campaign laws were violated. The issue before the Court is whether the putative class representative – here, STRS, but effectively, DeWine – is an appropriate fiduciary for the class, with DeWine having solicited large donations and then

[29] *See also, Ognibene v. Parkes*, 671 F.3d 174, 187 (2d Cir. 2011) (upholding N.Y. City laws limiting campaign contributions recognizing that "[s]ince neither candidate nor contributor is likely to announce a *quid pro quo*, the appearance of corruption has always been an accepted justification for a campaign contribution limitations [sic]"); *Yamada v. Weaver*, 872 F. Supp.2d 1023, 1063 (D. Haw. 2012) (upholding Hawaii's ban on campaign contributions from government contractors as it functions "to alleviate even the appearance of a connection (a *quid pro quo*) between a government contractor and a candidate for public office"); *Yamada v. Snipes*, 786 F.3d 1182, 1205 (9th Cir. 2015) ("Hawaii's government contractor contribution ban serves sufficiently important governmental interests by combating both actual and the appearance of quid pro quo corruption.").

appointed those donors as its proposed class counsel.[30] Amalgamated respectfully submits that STRS and DeWine are not, because they inexplicably retained two law firms, refused to subject their selection to judicial scrutiny, and failed to disclose the full extent of counsel's political and financial connections to DeWine, including the use of an Ohio lobbyist to curry favor.

STRS makes no attempt to justify why it was necessary to choose two law firms rather than one, or why Barrack Rodos cannot fulfill the role by itself.[31] (*See* ECF 28, at 13). The glaring absence of any justification for MMMB's role in this case that would validate the Class's payment of MMMB's legal bills begs the question of whether MMMB's appointment by DeWine is a political payback. More troubling, STRS contends that MMMB's appointment is not subject to the Court's scrutiny. STRS argues that judicial consideration "is irrelevant because MMM+B is not being put forward as STRS Ohio's selected Lead Counsel for this case." (ECF 28, at 14). This simply is semantics and another attempt to obfuscate the issue. More fundamentally, it is not true.

STRS admits that MMMB will be representing the Class, "assist[ing] in the Ohio funds' production of documents, preparations of answers to interrogatories and/or requests for admissions pertaining to the Ohio funds, preparations for depositions of Ohio fund representatives and/or their

---

[30] STRS points to two small donations by BFA partners Joseph Fonti ($800) and Javier Bleichmar ($250) in 2012 as "hypocrisy." There is no question, however, that Amalgamated's selection of BFA was not tainted by political contributions, which is the only potential issue here. Amalgamated is a private bank. Moreover, the contributions by Bleichmar and Fonti were made while at Labaton Sucharow LLP. When Bleichmar and Fonti established their own firm in 2014, they made the deliberate decision that BFA and its partners would not make political contributions, directly or indirectly, to government officials who have any role in the Firm's retention or selection of counsel, as a matter of firm policy and practice, to avoid any appearance that anything other than merit had led to its retention. (ECF 25.1, (Fonti Decl.) ¶ 4).

[31] Courts are very skeptical of the unexplained choice of two counsel because it can cause inefficiencies and costs for the class. *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015) (finding unexplained choice of second counsel evidence of impermissible lawyer-driven litigation); *Schriver v. Impac Mortg. Holdings, Inc.*, No. SACV 06-31, 2006 WL 6886020, at *8 (C.D. Cal. May 2, 2006) (same).

outside investment managers, and other such tasks." *Id.* at 16. These are tasks ordinarily executed by lead counsel for the Class. In fact, STRS further acknowledges that MMMB will be "under the direction of the Court-appointed Lead Counsel." *Id.* In other words, MMMB is a fiduciary to the class, as much as Lead Counsel. Ultimately, it is the Class, not DeWine or STRS, who will pay the attorney's fees for MMMB. The circumstances of DeWine's appointment of MMMB as "Special Counsel" therefore bear directly on whether STRS is an appropriate Lead Plaintiff.

STRS also has failed to disclose or explain that Barrack Rodos has retained McCloud since at least 2011, once DeWine was elected, as its lobbyist in Ohio, further expanding its connections to DeWine. McCloud reportedly served in DeWine's transition team after his election in 2010, has contributed to his campaigns, made (with her husband) over $100,000 in contributions to the Ohio GOP, and has also received lucrative legal retentions by the AG to represent Ohio in debt collection cases. McCloud further made a timely political donation in January 2016 to DeWine for $2,000 that coincided with the issuance of requests for qualifications for the retention of securities litigation counsel. Defendants will likely seek discovery into McCloud's lobbying activities and donations, and ask the obvious question of why a Pennsylvania firm like Barrack Rodos requires a lobbyist in Ohio.

All these connections between DeWine and his selected counsel raise the specter of pay-to-play. To be clear, it is not any one particular donation, contribution, fundraiser, retention, or common acquaintance that paints this picture. Instead, it is the mosaic of facts set forth above that suggest that Barrack Rodos and MMMB have made deliberate efforts over the course of years to influence in their favor the process of selecting counsel. The email in which DeWine directs that work be sent to Hadden strongly suggests such influence (*supra* § II. E.), in addition to (i) the continual and substantial donations to AG DeWine, Judge DeWine, and the Ohio GOP (*supra* §

II. B.); (ii) the aggregate sums exceeding tens of thousands of dollars (*id.*); (iii) the personal connections between members of DeWine's campaigns and transition teams with Barrack (McCloud) and MMMB (Hadden) (*supra* § II. C and D.); (iv) the timing of the January 2017 donation by Hadden only days after this case broke (*supra* § II.B.1.); (v) the apparent absence of any reason for Pennsylvania-based Barrack Rodos to be so involved in Ohio politics (*supra* § II.B.1 and D.); and (vi) MMMB's superfluous and unexplained role as special counsel with the obvious wasteful duplication of fees. It is the sum of these acts that requires inquiry into the retention process.[32]

Nevertheless, STRS claims that it has been previously appointed Lead Plaintiff, and that Barrack Rodos has been appointed Lead Counsel, in different cases unrelated to the case at bar, implying that this Court should blindly follow suit. (ECF 28, at 10-16). What happened in those other cases, however, is irrelevant to the concerns of the Class before the Court here. In none of the cases in which STRS was appointed was the issue of the influence of political contributions on the counsel appointment process raised at the lead plaintiff stage. Further, as a factual matter, the majority of the cases in which STRS has been appointed took place before the 2014 articles referenced above, which shed substantial light on DeWine's practices. Here, Amalgamated, a class member and institutional investor willing and able to serve as lead plaintiff for the class in the litigation, has raised serious issues based on substantial facts involving the political contributions of the specific counsel appointed by DeWine in a political culture that has been criticized for the appearance of pay-to-play. It is no answer to say that other courts – having never

[32] In view of this interconnected web, merely excluding MMMB from a role in this action is no remedy for curing STRS's inadequacy. While MMMB's role is perhaps the most inexplicable, it is STRS's inadequacy in selecting and overseeing its counsel that is the root cause. Thus, the only remedy is to exclude STRS's participation in whole.

considered the issue or these facts – have appointed STRS in other actions.

### C. The Vast Record Of Political Contributions By Proposed Counsel To DeWine Would Saddle The Class with Unnecessary Burdens And Risks That Render STRS Inadequate

The existing record of political contributions by STRS's proposed counsel will continue to burden the Class, and the Court, throughout this litigation if STRS is appointed lead plaintiff. Defendants will likely challenge class certification on this ground, and will conduct extensive and expensive discovery with respect to the relationship between DeWine and proposed counsel. The articles set forth above already disclose emails and documents concerning DeWine's selection of outside counsel and meetings with lobbyists like McCloud: "E-mails and schedules obtained by the Daily News show DeWine plays an active role in deciding special counsel assignments and he meets with politically connected lobbyists to talk about assignments."[33]

Defendants will seek discovery into these meetings and emails and documents showing the basis for the selection of counsel, and even DeWine's office calendar. "DeWine's office calendar shows he met with his former campaign fundraiser David Myhal at least twice to discuss special counsel assignments. Myhal is now a lobbyist who has represented law firms that do business with the attorney general's office."[34] Depositions will almost certainly be noticed. This extended discovery will lead to motion practice dealing with difficult privilege and sunshine-law issues under Ohio law. There is simply no reason the Class should have to pay for this, or for the Court to dedicate its limited resources to these unnecessary issues.

Recently, securities fraud defendants and courts have become more focused on the role of political contributions between lead counsel and lead plaintiffs. For example, in the *Knurr v.*

---

[33] 2d Meeks Decl. Ex. A (DAYTON DAILY NEWS, *Firms gave heavily …*), *supra* n.2.
[34] *Id.*

*Orbital ATK, Inc.* securities litigation, defendants took the unusual step of alerting the Court while the lead plaintiff motion was pending that they would seek discovery into pay-to-play issues and raise it at class certification.[35] Defendants did so even though the circumstances in *Orbital* were far less concerning than those here: *i.e.*, a total of $4000 in contributions, made seven years earlier, to a single member of a 15-member board, which had no role in the litigation decisions. This contrasts sharply with the tens of thousands of dollars contributed by Barrack Rodos and MMMB directly to DeWine, the sole decision-maker on the retention of counsel, along with the numerous other ways in which the firms made political contributions to Judge DeWine and the Ohio GOP.

As *Orbital* suggests, should the Court appoint STRS, the issue of political contributions to DeWine would continue to haunt this case. The Class would face the risk of the denial of class certification due to an inadequate class representative, leading to a substantial delay while another is substituted, or, at worst, no recovery at all. Even if STRS were to be certified as a class representative, Defendants are likely to raise pay-to-play again at trial, at a minimum leading to extensive evidentiary motion practice, and at worst coloring the trial disfavorably for the Class (or, in the alternative, entry into a suboptimal settlement to avoid the public airing of these facts at trial). It will be damaging to have a jury hear the class representative accused of collusion in a case asserting fraud claims against the defendant. Even if successful, the Class will foot the presumably-substantial bill for this otherwise unnecessary sideshow. The Class will not be able to avoid a significant distraction throughout the litigation which Defendants will have every incentive to exploit in order to drive down the value of the Class's recovery.

---

[35] *See* Def's Notice of Authorities & Info Re. Pending Mots. For Lead Pl. Appt., *Orbital*, No. 16-cv-01031 (E.D. Va. Oct. 27, 2016), ECF No. 25. The Court in *Orbital* had in a previous case warned defendants to raise any significant concerns about a proposed lead plaintiff that may become an issue at class certification. *See id* (at 1).

Nevertheless, STRS goes so far as to argue extensively that political donations by counsel to a decision maker can never be a sufficiently "central issue" in the litigation to constitute a distraction and disqualify counsel. STRS states that "political contributions that BR&B made in 2012 and 2013 have nothing to do with the merits of the case, the showing of market efficiency required for class certification in a federal securities law case, the typicality of STRS Ohio's claims, or the ability of its proposed Lead Counsel to prosecute this Action on behalf of the putative Class. In short, they are simply not issues in the litigation, let alone a 'major focus of the litigation.'" (ECF 28, at 5). This argument misses the point. The fact that the issue of political contributions to DeWine is not part of the Class's *affirmative* case does not mean that Defendants will not raise it as their defense. STRS ignores that Defendants will make this an issue, as will class members who will scrutinize the adequacy of the settlement. DeWine, Barrack Rodos and MMMB cannot ignore that this unprecedented factual record exists in the public domain, which will undoubtedly result in costly litigation and risks for the Class.

### D. In The Alternative, Amalgamated Has Established A "Reasonable Basis" To Conduct Discovery Into STRS's Adequacy As Lead Plaintiff

Although Amalgamated believes that the evidence more than establishes that the political contributions from counsel to DeWine will be a material distraction of such magnitude as to disqualify STRS at this stage, in the event the Court has any doubt, the proper avenue is to give the Class an opportunity to develop a more extensive record. The PSLRA provides a specific mechanism for discovery into STRS's adequacy upon a showing that "demonstrates a reasonable basis for finding that the presumptively most adequate plaintiff is incapable of adequately representing the class." 15 U.S.C. 78u-4(a)(3)(B)(iv). At a minimum, Amalgamated has established such a "reasonable basis" and respectfully requests discovery into these matters in the event the Court is not inclined to reject STRS's motion now. *See e.g. Andrade v. American*

*Apparel, Inc.*, CV 10-06352, 2011 WL 1313110 (C.D. Cal. Jan. 21, 2011) (finding a reasonable basis to grant a lead plaintiff movant's request for discovery into a competing movant's alleged misconduct and tax underreporting).

## IV. AMALGAMATED SHOULD BE APOINTED LEAD PLAINTIFF AND BFA SHOULD BE APPOINTED LEAD COUNSEL

In light of the disqualifying inadequacy of STRS, Amalgamated has the largest financial interest of the remaining movants in the case, and is therefore the presumptive most adequate plaintiff under the PSLRA. Amalgamated respectfully submits that the Court should thus appoint Amalgamated as Lead Plaintiff, and approve of its selection of BFA as Lead Counsel, and Susan Podolsky as Liaison Counsel.

Neither STRS nor any other movant has raised any issues as to Amalgamated's adequacy or typicality, or any reason why the presumption that Amalgamated is the most adequate plaintiff could be rebutted. The only argument that STRS advances in opposition to Amalgamated is that STRS has the largest financial interest. (ECF 27). Amalgamated acknowledges that this is true. Yet, that is entirely beside the point as the unique defenses against STRS disqualify it from leading the Class as a fiduciary regardless of how large a loss it claims.

Amalgamated is more than merely an adequate Lead Plaintiff; it is extremely well-suited to lead this case. "Amalgamated has pursued a program of vigorous and aggressive shareholder activism." (ECF 18-1 (Meeks Decl.) Ex. D ¶3). It has been appointed lead plaintiff and class representative in numerous significant securities fraud cases and "played a very active role in each … including by discussing and overseeing litigation strategy with counsel, sitting for depositions, producing discovery materials, participating in settlement negotiations, and approving all important litigation documents." *Id.* at ¶¶5-6.[36] In contrast to STRS, Amalgamated's in-house

---

[36] Amalgamated has also led two recent high-profile and successful derivative actions.

counsel and senior management retain outside counsel and actively monitor and run the litigation.

Proposed counsel on behalf of Amalgamated is also extremely well qualified. BFA and Podolsky have an exceptional history litigating complex securities litigations together, having secured the largest and third largest securities class actions—and indeed the largest common fund—recoveries in the history of the Eastern District of Virginia. *See In re Genworth Financial, Inc. Sec. Litig*, No. 14-cv-682 (Sept. 26, 2016) ($219 million) and *In re Computer Sciences Corp. Sec. Litig*. 11-cv-610 (Sept. 20, 2013) ($97 million). In the recent *Genworth* matter, Magistrate Judge John Facciola (Ret.) undertook an exhaustive review of their collective efforts, issuing a declaration in support of the request for attorneys' fees. *See* 2d Meeks Decl. Ex Q (Facciola *Genworth* Decl.). Magistrate Judge Facciola assessed whether assignments were undertaken by the proper level of experienced attorneys, (¶¶ 11, 18-19), whether there was any duplication of effort (¶67), the skill and proficiency deployed (¶¶ 44-45), as well as the outsized result achieved (¶¶ 37-41).[37] Amalgamated and its selected counsel are more than adequate and typical, and will maintain a singular focus on maximizing the Class's recovery.

## V. CONCLUSION

For the foregoing reasons, Amalgamated respectfully requests that the Court: (1) consolidate the related cases; (2) appoint Amalgamated as Lead Plaintiff; (3) approve Amalgamated's selection of BFA as Lead Counsel; and (4) grant such other relief as the Court may deem just and proper.

---

*Amalgamated v. Brock*, 15-cv-00157 (E.D. Va. Nov. 17, 2016); *In re News Corp. Shareholder Litig*., 6316-VCN (Del. Ch. June 26, 2013).

[37] "I can say, as a magistrate judge who managed discovery and pre-trial proceedings in many cases, that given the complicated nature approving fraud in this case, [the] schedule was most demanding upon counsel. Counsel's ability to manage the discovery process and develop their trial narrative in this compressed timeframe was impressive." (¶33).

Dated: April 17, 2017

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Wilson M. Meeks III*
Wilson Meeks (D00334)
Javier Bleichmar (*pro hac vice* to be filed)
Joseph Fonti (*pro hac vice* to be filed)
Robyn R. English (D00406)
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
wmeeks@bfalaw.com
jbleichmar@bfalaw.com
jfonti@bfalaw.com
renglish@bfalaw.com

Lesley E. Weaver (*pro hac vice* to be filed)
1999 Harrison Street, Suite 670
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
lweaver@bfalaw.com

*Counsel for Amalgamated Bank and [Proposed] Lead Counsel for the Class*

**LAW OFFICES OF**
**SUSAN R. PODOLSKY**
Susan R. Podolsky (D.C. Bar No. 415990)
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571)366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Liaison Counsel for Amalgamated Bank and [Proposed] Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the registered participants. Executed on April 17, 2017.

*/s/ Wilson M. Meeks III*
Wilson Meeks (D00334)