# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PATRICIA A. SHENK, *et al.*,

                  Plaintiffs,

   vs.

MALLINCKRODT PLC,
MARK TRUDEAU,
MATTHEW K. HARBAUGH, and
HUGH O'NEILL,

                  Defendants.

No. 1:17-cv-00145-DLF

## DEFENDANT MALLINCKRODT'S MOTION TO DISMISS

Pursuant to the Private Securities Litigation Reform Act of 1995 and Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendant Mallinckrodt plc ("Mallinckrodt") respectfully moves this Court for entry of an order dismissing Plaintiff's Consolidated Complaint (Doc. No. 51) in the above-captioned matter as to Mallinckrodt.

Plaintiff's Consolidated Complaint is deficient and must be dismissed for a number of reasons:

1. Plaintiff has failed to allege with particularity any material misstatements or omissions;

2. Plaintiff has failed to allege any particularized facts raising a strong inference of scienter; and

3. Plaintiff's Consolidated Complaint is devoid of any loss causation allegations for several of the alleged misstatements.

For these reasons, and those more fully explained in Mallinckrodt's accompanying Memorandum in Support, Plaintiff's Consolidated Complaint should be dismissed with prejudice as to Mallinckrodt.

**Oral Hearing Requested**

Pursuant to LCvR 78.1, Mallinckrodt requests an oral hearing on its Motion.


July 17, 2018                           Respectfully submitted,

                                        /s/ Moxila A. Upadhyaya
                                        Moxila A. Upadhyaya (DC Bar # 494373)
                                        VENABLE LLP
                                        600 Massachusetts Ave., NW
                                        Washington, DC 20001
                                        Phone: (202) 344-4690
                                        Fax: (202) 344-8300
                                        MAUpadhyaya@venable.com

                                        Rachelle Silverberg (*admitted pro hac vice*)
                                        Jonathan Siegel (*admitted pro hac vice*)
                                        WACHTELL, LIPTON, ROSEN & KATZ
                                        51 West 52nd Street
                                        New York, NY 10019
                                        Phone:  (212) 403-1000
                                        Fax:  (212) 403-2000
                                        RSilverberg@wlrk.com
                                        JRSiegel@wlrk.com

                                        *Counsel for Defendant Mallinckrodt plc*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PATRICIA A. SHENK, *et al.*,

                      Plaintiffs,

      vs.

MALLINCKRODT PLC,
MARK TRUDEAU,
MATTHEW K. HARBAUGH, and
HUGH O'NEILL,

                    Defendants.

No. 1:17-cv-00145-DLF

**ORAL ARGUMENT REQUESTED**

## DEFENDANT MALLINCKRODT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS

VENABLE LLP
600 Massachusetts Ave., NW
Washington, D.C. 20001
Phone: (202) 344-4690
Fax: (202) 344-8300

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Phone: (212) 403-1000
Fax: (212) 403-2000

*Attorneys for Mallinckrodt plc*

Date: July 17, 2018

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND .............................................................................................. 4

    A.    The parties........................................................................................ 4

    B.    Plaintiff's claims ............................................................................. 4

ARGUMENT.................................................................................................. 12

    I.    PLAINTIFF FAILS TO ALLEGE WITH PARTICULARITY ANY
        MATERIAL MISSTATEMENTS OR OMISSIONS........................................... 12

        A.    Plaintiff alleges no material misstatements or omissions regarding
            Acthar's competitive position and business prospects............................. 12

            1.    Plaintiff has failed to allege any material omissions because
                   all material facts regarding the alleged antitrust issues were
                   disclosed................................................................................ 13

            2.    Mallinckrodt was not required to use Plaintiff's preferred
                   pejorative language or accuse itself of criminality. ...................... 16

            3.    Plaintiff has failed to allege any "anticompetitive scheme." ........ 17

        B.    The Complaint alleges no material misstatements or omissions
            regarding the FTC investigation. ........................................................ 19

            1.    The July 2014 Proxy. ................................................................. 19

            2.    The absence of "pending" FTC litigation. ................................... 20

        C.    The Complaint lacks adequate allegations that Trudeau's statement
            about Acthar's Medicare exposure was materially false or
            misleading. .................................................................................... 21

        D.    The other alleged misstatements in the Complaint are also not false
            or misleading, and are immaterial or otherwise nonactionable. ............... 28

    II.    PLAINTIFF FAILS TO ALLEGE PARTICULARIZED FACTS RAISING
        A STRONG INFERENCE OF SCIENTER. ..................................................... 35

        A.    Plaintiff does not allege any motive by Defendants to commit
            fraud. ............................................................................................ 36

        B.    Plaintiff does not allege strong circumstantial evidence of
            conscious misbehavior or recklessness. ................................................ 38

            1.    The alleged anticompetitive scheme. ........................................... 39

2. Trudeau's Medicare estimate. ........................................................ 41

3. Plaintiff's remaining allegations. ................................................... 44

III. THE COMPLAINT FAILS TO ALLEGE LOSS CAUSATION FOR SEVERAL OF THE ALLEGED MISSTATEMENTS. ...................................... 44

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co.* v. *United States*,
  328 U.S. 781 (1946) .................................................................... 18 n.11

*Capitol Justice, LLC* v. *Wachovia Corp.*,
  2008 WL 11388566 (D.D.C. June 11, 2008) .................................... 38

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ............................................................ 21, 30

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Waters Corp.*,
  632 F.3d 751 (1st Cir. 2011) ............................................................ 43

\* *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ............................................................. 17

*City of Roseville Emps.' Ret. Sys.* v. *Nokia Corp.*,
  2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) .................................... 20

*Color Sys., Inc.* v. *Meteor Photo Reprographic Sys., Inc.*,
  1987 WL 11085 (D.D.C. May 8, 1987) ......................................... 38-39

*Copperweld Corp.* v. *Indep. Tube Corp.*,
  467 U.S. 752 (1984) ...................................................................... 18 n.11

*Cozzarelli* v. *Inspire Pharm.*,
  549 F.3d 618 (4th Cir. 2008) .......................................................... 42

*Currie* v. *Matesanz*,
  281 F.3d 261 (1st Cir. 2002) ...................................................... 21 n.14

*Diaz* v. *Shallbetter*,
  984 F.2d 850 (7th Cir. 1993) ...................................................... 21 n.14

*Downs* v. *Dir., Office of Workers Comp. Programs, U.S. Dep't of Labor*,
  803 F.2d 193 (5th Cir. 1986) ...................................................... 21 n.14

\* *Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ........................................................................ 44, 45

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................ 27 n.18, 36, 37, 38

*Emps.' Ret. Sys. of Gov't of the Virgin Islands* v. *Blanford*,
  794 F.3d 297 (2d Cir. 2015) ............................................................ 36

\* *Erica P. John Fund, Inc.* v. *Halliburton Co.*,
  563 U.S. 804 (2011) ........................................................................ 12

*Fire & Police Pension Ass'n of Colo.* v. *Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015) ............................................................ 37

*Freeland* v. *Iridium World Commc'ns, Ltd.*,
  545 F. Supp. 2d 59 (D.D.C. 2008) .................................................. 44

*Gamm* v. *Sanderson Farms, Inc.*,
  2018 WL 1319157 (S.D.N.Y. Jan. 19, 2018) ...................................................... 18

*Grossman* v. *Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ...................................................................... 23

*Hogan* v. *Pilgrim's Pride Corp.*,
  2018 WL 1316979 (D. Colo. Mar. 14, 2018) ............................................... 17-18

*Howard* v. *Liquidity Servs., Inc.*,
  177 F. Supp. 3d 289 (D.D.C. 2016) ................................................................ 12

*Ieradi* v. *Mylan Labs., Inc.*,
  230 F.3d 594 (3d Cir. 2000) ........................................................................... 16

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ........................................................................... 38

*In re Anadarko Petrol. Corp. Class Action Litig.*,
  957 F. Supp. 2d 806 (S.D. Tex. 2013) ............................................................ 43

*In re Bally Total Fitness Sec. Litig.*,
  2006 WL 3714708 (N.D. Ill. July 12, 2006) .................................................... 39

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................. 13

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)........................ 41

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................... 37 n.24, 44

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..................................................................... 20, 34

*In re Comput. Sci. Corp. Sec. Litig.*,
  890 F. Supp. 2d 650 (E.D. Va. 2012) .............................................................. 39

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) .......................................................................... 26

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & ERISA Litig.* ("*In re Fannie Mae I*"),
  503 F. Supp. 2d 25 (D.D.C. 2007)............................................................... 35-36

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & ERISA Litig.* ("*In re Fannie Mae II*"),
  892 F. Supp. 2d 59 (D.D.C. 2012)................................................................... 40

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015)............................................................... 13, 27, 30

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ............................................................. 37

\* *In re Lions Gate Entm't Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016)................................................................. 19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................ 13

*In re Merrill Lynch Tyco Research Sec. Litig.*,
2004 WL 305809 (S.D.N.Y. Feb. 18, 2004) ................................................ 21, 24

*In re MGT Capital Invs., Inc. Sec. Litig.*,
2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018) ...................................................... 17

*In re NTL, Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004) .................................................................... 21

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011) ......................................................... 19 n.13

*In re Supreme Indus., Inc. Sec. Litig.*,
2018 WL 2364931 (N.D. Ind. May 23, 2018) ............................................... 26, 42

\*       *In re XM Satellite Radio Holdings Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007) ................................ 13, 16, 17, 23, 28, 31

*Kaempe* v. *Myers*,
367 F.3d 958 (D.C. Cir. 2004) ................................................................... 22 n.15

\*       *Kowal* v. *MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) .................................................................... 16, 31

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw.*
*Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2013) .................. 40

\*       *Lorenzo* v. *SEC*,
872 F.3d 578 (D.C. Cir. 2017) .............................................................................. 35

*Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ...................................................................... 40 n.25

*Markman* v. *Whole Foods Mkt., Inc.*,
2016 WL 10567194 (W.D. Tex. Aug. 19, 2016) .................................................. 19

*McDonald* v. *Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*,
897 F.2d 1510 (9th Cir. 1990) ..................................................................... 21 n.14

*Merck & Co., Inc.* v. *Reynolds*,
559 U.S. 633 (2010) .............................................................................................. 42

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000) ................................................................................ 41

\*       *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) .................................................................................... 25, 26

*Paskar* v. *City of New York*,
3 F. Supp. 3d 129 (S.D.N.Y. 2014) ................................................................. 4 n.4

*Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*,
2017 WL 1192888 (S.D.N.Y. Mar. 29, 2017) ..................................................... 13

*Phelps* v. *Stomber*,
  883 F. Supp. 2d 188 (D.D.C. 2012) ................................................................. 17

\*   *Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*,
  679 F.3d 952 (7th Cir. 2012) ........................................................................ 42

*Plumbers Local #200 Pension Fund* v. *Wash. Post Co.*,
  930 F. Supp. 2d 222 (D.D.C. 2013) ............................................................ 37, 38

*Plumbers Local No. 200 Pension Fund* v. *Wash. Post Co.*,
  831 F. Supp. 2d 291 (D.D.C. 2011) ................................................................ 40

*Raab* v. *Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ........................................................................... 35

*Rand-Heart of New York, Inc.* v. *Dolan*,
  812 F.3d 1172 (8th Cir. 2016) ...................................................................... 38

*Richman* v. *Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012) ............................................................ 19

*Ross* v. *Walton*,
  668 F. Supp. 2d 32 (D.D.C. 2009) ...................................................... 4 n.4, 39

*Staehr* v. *Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................... 4 n.4

*Stevens* v. *InPhonic, Inc.*,
  662 F. Supp. 2d 105 (D.D.C. 2009) ............................................ 4 n.4, 36, 41

*Swartz* v. *Meyers*,
  204 F.3d 417 (3d Cir. 2000) ..................................................................... 20-21

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008) ......................................................................... 36

\*   *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................ 1, 4 n.4, 22 n.15, 36, 40, 41

*Texas* v. *Caremark Rx, Inc.*,
  2013 WL 12202702 (W.D. Tex. Jan. 2, 2013) ........................................ 23 n.16

*Turner* v. *MagicJack VocalTec, Ltd.*,
  2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) ..................................................... 37

*U.S. ex rel. Polansky* v. *Pfizer, Inc.*,
  2009 WL 1456582 (E.D.N.Y. May 22, 2009) ................................................ 39

*United States* v. *Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................. 18 n.11

*Venable LLP* v. *Overseas Lease Grp., Inc.*,
  2015 WL 4555372 (D.D.C. July 28, 2015) ................................................... 30

*Waterford Twp. Police & Fire Ret. Sys.* v. *Smithtown Bancorp., Inc.*,
  2014 WL 3569338 (E.D.N.Y. July 18, 2014) ............................................ 19 n.13

*Williams* v. *Coyle*,
   167 F.3d 1036 (6th Cir. 1999) ........................................................................ 21 n.14

**Statutes**

\*    15 U.S.C. § 78u-4 ....................................................................................... 1, 4, 12

15 U.S.C. § 78u-5 ............................................................................................31

17 C.F.R. § 229.103 .......................................................................................6 n.5

17 C.F.R. § 240.16a-3 ................................................................................. 37 n.24

42 U.S.C § 1396r-8 ....................................................................................23 n.16

**Other Authorities**

*Black's Law Dictionary* (6th ed., 1990)..................................................................... 21

S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679................................................. 1

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (Aug. 19, 1999)....................27 n.18

# INDEX OF EXHIBITS*

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| **1** | Cornerstone Research, *Securities Class Action Filings — 2017 Year in Review* (2018), https://bit.ly/2kSPg7w |
| **2** | Ed Silverman, *Drug and Device Makers are Being Hit With More Securities Fraud Lawsuits*, Wall St. J. (Mar. 18, 2015), https://on.wsj.com/2mkQCZm |
| **3** | Excerpt from Questcor Pharmaceuticals, Inc., 2012 Annual Report (Form 10-K) (Feb. 27, 2013) |
| **4** | Complaint, *Retrophin, Inc.* v. *Questcor Pharm., Inc.*, No. CV14-00026-JLS (C.D. Cal. Jan. 7, 2014) |
| **5** | Excerpt from Questcor Pharmaceuticals, Inc., 2013 Annual Report (Form 10-K) (Feb. 26, 2014) |
| **6** | Press Release, Mallinckrodt Pharmaceuticals, *Mallinckrodt Pharmaceuticals And Questcor Pharmaceuticals Enter Into Definitive Merger Agreement Under Which Mallinckrodt Will Acquire Questcor For Approximately $5.6 Billion, Creating A Diversified, High-Growth Specialty Pharmaceuticals Company* (Apr. 7, 2014) |
| **7** | Excerpt from Mallinckrodt Plc, Registration Statement (Form S-4) (May 16, 2014) |
| **8** | Excerpt from Questcor Pharmaceuticals, Inc., Definitive Proxy Statement (Schedule 14A) (July 11, 2014) |
| **9** | Excerpt from Mallinckrodt Plc, Q3 2015 Quarterly Report (Form 10-Q) (Aug. 4, 2015) |
| **10** | Excerpt from Mallinckrodt Plc, 2015 Annual Report (Form 10-K) (Nov. 24, 2015) |
| **11** | Excerpt from Mallinckrodt Plc, Q1 2015 Quarterly Report (Form 10-Q) (Feb. 3, 2015) |
| **12** | Excerpt from Mallinckrodt Plc, Q2 2015 Quarterly Report (Form 10-Q) (May 5, 2015) |

---

\*      To aid the Court's review of these documents and to reduce the volume of material submitted to the Court, certain of the exhibits (as noted in the index) are being provided in excerpted form. Full versions of such documents will be provided upon request of the Court or counsel.

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| **13** | Excerpt from Mallinckrodt Plc, Q1 2016 Quarterly Report (Form 10-Q) (Feb. 2, 2016) |
| **14** | Excerpt from Mallinckrodt Plc, Q2 2016 Quarterly Report (Form 10-Q) (May 3, 2016) |
| **15** | Excerpt from Mallinckrodt Plc, Q3 2016 Quarterly Report (Form 10-Q) (Aug. 2, 2016) |
| **16** | Excerpt from Mallinckrodt Plc, 2016 Annual Report (Form 10-K) (Nov. 29, 2016) |
| **17** | Complaint, *FTC* v. *Mallinckrodt ARD Inc.*, No. 1:17-cv-00120 (Jan. 25, 2017) |
| **18** | Stipulated Order for Permanent Injunction and Equitable Monetary Relief, *FTC* v. *Mallinckrodt ARD Inc.*, No. 1:17-cv-00120 (Jan. 18, 2017) |
| **19** | Mallinckrodt Plc, Current Report (Form 8-K) (Oct. 6, 2015) |
| **20** | Press Release, Mallinckrodt Pharmaceuticals, *Mallinckrodt plc Provides Business Update Including Fiscal Year 2016 Financial Guidance Excluding Contrast Media and Delivery Systems (CMDS) and Ex-CMDS Historical Financial Information* (Oct. 6, 2015) |
| **21** | Investor Call Transcript, Mallinckrodt Pharmaceuticals (Oct. 6, 2015) |
| **22** | Citron Research, *Mallinckrodt CEO FRAUD exposed by the new Medicare Drug Dashboard* (Nov. 16, 2016), https://bit.ly/2LcK6SC |
| **23** | Excerpt from Staff of the Division of Economic and Risk Analysis of the SEC, *Short Sale Position and Transaction Reporting* (June 5, 2014), https://bit.ly/2mjdxnM |
| **24** | Jesse Barron, *The Bounty Hunter of Wall Street*, N.Y. Times (June 8, 2017), https://nyti.ms/2snhvR7 |
| **25** | Matt Wirz, *The 'Short' Who Sank Valeant Stock*, Wall St. J. (Oct. 22, 2015), https://on.wsj.com/2ykRZjt |
| **26** | Excerpt from Mallinckrodt Plc, 2017 Annual Report (Form 10-K) (Feb. 27, 2018) |
| **27** | Complaint, *Shenk* v. *Mallinckrodt Plc*, Case 1:17-cv-00145 (Jan. 23, 2017) |
| **28** | Citron Research, *Questcor Update: Aetna Denies Nearly All Coverage for Acthar Gel* (Sept. 19, 2012), https://bit.ly/2Jrmfd0 |

| EXHIBIT | DESCRIPTION |
|---|---|
| 29 | Citron Research, *Questcor: When Things Go From Bad to Worse, and Even Worse* (Oct. 17, 2012), https://bit.ly/2mjOgKd |
| 30 | Consolidated Class Action Complaint, *In re Questcor Pharm., Inc. Sec. Litig.*, No. 8:12-cv-01623-DMG-JPR (C.D. Cal. Mar. 5, 2013) |
| 31 | Jefferies Analyst Report, *Questcor Pharmaceuticals — QCOR Acquires Rights to Synacthen and Removes Overhang of Potential Competitor* (June 11, 2013) |
| 32 | Andrew Pollack, *Questor Pays $135 Million to Acquire Rights to a Competitor's Drug*, N.Y. Times (June 14, 2013), https://nyti.ms/1456cHw |
| 33 | Oppenheimer Analyst Report, *Questcor Pharmaceuticals — Assuming Coverage; Raising Rating To Outperform With $57 PT* (June 20, 2013) |
| 34 | PiperJaffray Analyst Report, *Questcor Pharmaceuticals — Synacthen Deal Can't Hurt; Was Not Much of a Threat to Acthar to Begin With* (June 11, 2013) |
| 35 | Ladenburg Thalmann Analyst Report, *Questcor Pharmaceuticals — Synacthen Acquisition Is A Good Move And We Expect Better Acthar Performance Than Previously Modeled; Maintaining BUY Rating And Increasing PT to $54.00 from $35.00* (June 11, 2013) |
| 36 | Janney Capital Markets Analyst Report, *QCOR Acquisition of Synacthen a Smart Competitive Move* (June 11, 2013) |
| 37 | Citron Research, *FTC Investigates Questcor: Serious Jeopardy for Synacthen Deal* (Nov. 25, 2013), https://bit.ly/2LiXX6z |
| 38 | Letter from Amy Klobuchar, Chairman, Subcommittee on Antitrust, Competition Policy and Consumer Rights to Hon. Edith Ramirez, Chairwoman Federal Trade Commission (Aug. 1, 2013) |
| 39 | Citron Research, *Questcor in Cover-Up Mode: Deleting Evidence from its Website . . . BUT Citron Finds the Smoking Gun and Presents it Here for the Federal Trade Commission* (Dec. 3, 2013), https://bit.ly/2NU6u1r |
| 40 | CMS, Medicare and Medicaid Drug Spending Dashboard 2015 — Medications List, https://go.cms.gov/2fVkUAn *and* https://go.cms.gov/2fVkUAn |
| 41 | 2015 Medicare Drug Spending Dashboard, CMS (Dec. 7, 2016), https://go.cms.gov/2fl5u53 |
| 42 | 2015 Medicaid Drug Spending Dashboard, CMS (Dec. 7, 2016), https://go.cms.gov/2f8trPi |

| EXHIBIT | DESCRIPTION |
|---|---|
| 43 | Excerpt from 2017 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds |
| 44 | Mizuho Analyst Report, *Mallinckrodt PLC — Ignore the Biased Citron Report! Buy MNK* (Nov. 16, 2016) |
| 45 | Leerink Analyst Report, *Mallinckrodt Plc — Is Left Right? Short Report Appears to Overstate Acthar CMS Sales* (Nov. 16, 2016) |
| 46 | Deutsche Bank Analyst Report, *Mallinckrodt — Quick thoughts on Acthar "News"* (Nov. 16, 2016) |
| 47 | Bank of America Merrill Lynch Analyst Report, *Mallinckrodt plc — Acthar mini-dive; weakness presents opportunity heading into F4Q on 11/29* (Nov. 17, 2016) |
| 48 | UBS Analyst Report, *Mallinckrodt Plc — Addressing Some Questcor Issues* (May 13, 2014) |
| 49 | Excerpt from Earnings Call Transcript, Mallinckrodt Plc (May 8, 2017) |
| 50 | Excerpt from Earnings Call Transcript, Mallinckrodt Plc (Aug. 4, 2015) |
| 51 | Excerpt from Business Update Call Transcript, Mallinckrodt Plc (Jan. 19, 2017) |
| 52 | Excerpt from Earnings Call Transcript, Mallinckrodt Plc (Feb. 7, 2017) |
| 53 | Excerpt from Earnings Call Transcript, Mallinckrodt Plc (Aug. 8, 2017) |
| 54 | Excerpt from Mallinckrodt Plc, Annual Report (Form 10-K) (Nov. 25, 2014) |
| 55 | Press Release, Mallinckrodt Pharmaceuticals, *Mallinckrodt Presents Facts to Refute Short-Seller Claims* (May 19, 2017) |
| 56 | Mallinckrodt Plc, Statement of Changes in Beneficial Ownership — Trudeau (Form 4) (Feb. 4, 2014) |
| 57 | Mallinckrodt Plc, Statement of Changes in Beneficial Ownership — Trudeau (Form 4) (June 12, 2017) |
| 58 | Mallinckrodt Plc, Statement of Changes in Beneficial Ownership — Harbaugh (Form 4) (Feb. 4, 2014) |
| 59 | Mallinckrodt Plc, Statement of Changes in Beneficial Ownership — Harbaugh (Form 4) (July 5, 2017) |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 60 | Mallinckrodt Plc, Statement of Changes in Beneficial Ownership — O'Neill (Form 4) (Jan. 6, 2014) |
| 61 | Mallinckrodt Plc, Statement of Changes in Beneficial Ownership — O'Neill (Form 4) (June 12, 2017) |
| 62 | Reply to Tunde Otulana, *Uses of H.P. Acthar Gel in the Clinical Setting*, 178(4) JAMA Internal Medicine 583 (Apr. 2018) |

## PRELIMINARY STATEMENT

In 1995, Congress recognized an epidemic of "frivolous 'strike' suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation." S. Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683. These lawsuits, Congress found, were "often based on nothing more than a company's announcement of bad news, not evidence of fraud." *Id.* Too often, they targeted entire industries suffering downturns — like tech companies in the '80s and banks in the '90s. More recently, the focus has shifted to pharmaceutical companies: the year this case was filed, filings against pharmaceutical, biotechnology, and healthcare companies made up 31% of all "core" securities fraud lawsuits.[1]

To curb this "abusive litigation . . . Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA)." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Among other protections, the statute replaced the standard liberal rules of pleading with "heightened pleading requirements" for actions "brought pursuant to § 10(b) and Rule 10b-5." *Tellabs*, 551 U.S. at 321. Under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and must also "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (b)(2)(A) (emphasis added).

The Consolidated Complaint (the "Complaint") does not come close to meeting these stringent standards. It ignores information already in the public domain; relies on blatant distortions of the relevant data; and recycles criticisms that were lodged years before the class period began. In addition, the Complaint utterly fails to plead the strong inference of scienter required by the PSLRA. It should be dismissed.

---

[1] *See* Ex. 1 (2017 Cornerstone Research report); *see also* Ex. 2 (Mar. 18, 2015 Wall St. J. article) (discussing increase in securities fraud filings against pharmaceutical companies).

More specifically:

<u>**Alleged Misstatements and Omissions**</u>

1.      *"Anticompetitive" conduct*.  Plaintiff claims that Defendants failed to disclose Mallinckrodt's supposed "illegal" "anticompetitive scheme" to protect Acthar's "monopoly." That claim is meritless:  (1) the potential antitrust risk was amply disclosed and otherwise known to the market; (2) Defendants were not required to characterize that disclosed risk in Plaintiff's preferred negative light; and (3) in any event, Mallinckrodt did *not* violate the antitrust laws, and the Complaint does not plausibly allege otherwise.  *See infra* pp. 12-19.

2.      *The FTC investigation.*  Plaintiff also claims two alleged misstatements or omissions regarding the FTC investigation:  (a) that Mallinckrodt did not disclose the investigation in a July 2014 joint proxy/prospectus (the "July 2014 Proxy"), and (b) that Mallinckrodt falsely stated there was no "pending" FTC litigation in the late stages of the investigation.  Neither is actionable.  A company has no duty to disclose an early-stage regulatory investigation — which is all that existed in July 2014; the existence of a related civil litigation *was* disclosed; and speculation of an FTC investigation was already in the market. Nothing more was required.  The related allegation on the disclosure of no "pending" litigation prior to the filing of the FTC's complaint is frivolous.  By definition, a litigation *is not* "pending" until a complaint is filed.  *See infra* pp. 19-21.

3.      *Medicare revenues.*  Plaintiff claims that Mallinckrodt CEO Mark Trudeau intentionally mischaracterized the percentage of Acthar revenues from Medicare and Medicaid when he provided an off-the-cuff estimate that Mallinckrodt's "Acthar exposure to Medicare" was "maybe a little bit higher than" "about a quarter . . . roughly."  But Plaintiff relies primarily on the discredited report of a "short seller" who misrepresented the data and engaged in bad math — and who was immediately contradicted by numerous analysts who cover the stock.  And subsequent

statements by other Mallinckrodt executives — relied on by Plaintiff — are consistent with Trudeau's statement.  *See infra* pp. 21-28.

4.      *Other.*  The Complaint's grab bag of other alleged misrepresentations — relating to (i) insurers' resistance to paying for Acthar; (ii) Acthar's efficacy; (iii) projected Acthar sales growth; (iv) Acthar's proportion of business attributable to neurology; (v) a European manufacturer's cessation of Synacthen production; and (vi) the proportion of Mallinckrodt's overall business attributable to Acthar — all fail because Plaintiff has failed to allege that any of the challenged statements were material misrepresentations or because the alleged omissions involved publicly known information.  Moreover, several of the alleged misstatements are forward-looking statements protected by the PSLRA's safe harbor.  *See infra* pp. 28-35.

### *Scienter*

5.      The Complaint also fails to allege any plausible inference, let alone a strong inference, of scienter — providing an additional and independent basis for dismissal.  The Individual Defendants collectively acquired hundreds of thousands of shares of Mallinckrodt stock during the class period — at allegedly inflated prices — thereby defeating any suggestion of any motive to commit fraud.  And while the Complaint contains conclusory allegations about the Individual Defendants' alleged access to information from their positions at the company, those allegations are inadequate as a matter of law.  *See infra* pp. 35-44.

### *Loss Causation*

6.      For several of the challenged statements, Plaintiff makes no effort to allege loss causation, a required element of a § 10(b) claim.  *See infra* pp. 44-45.[2]

---

[2]      Plaintiff's Section 20(a) claim is not asserted against Mallinckrodt.

# BACKGROUND

## A.    The parties

State Teachers Retirement System of Ohio is the Lead Plaintiff appointed pursuant to the

PSLRA, 15 U.S.C. § 78u-4(a)(3), by the Court's March 9, 2018 order.  Doc. No. 45.

Defendant Mallinckrodt plc ("Mallinckrodt") is a pharmaceutical company that develops

and produces branded and generic specialty pharmaceutical products.  CC ¶ 44.[3]  The Individual

Defendants are senior officers of Mallinckrodt:  Chief Executive Officer Mark Trudeau; Chief

Financial Officer Matthew K. Harbaugh; and Executive Vice President Hugh O'Neill.  CC ¶ 2.

## B.    Plaintiff's claims

The Complaint alleges three main categories of supposed material omissions or

misstatements:

- Failure to disclose (a) that Mallinckrodt was engaged in an alleged "illegal" and "anticompetitive" scheme to protect Acthar from competition by Synacthen, and (b) the existence of an FTC investigation into Questcor's purchase of Synacthen;

- An alleged misstatement by CEO Trudeau, in response to an analyst question, about the portion of Acthar's revenue received from Medicare; and

- Alleged misstatements about the extent of insurer restrictions on Acthar, the evidence of Acthar's efficacy, projected growth for Acthar, and various other topics.

The relevant facts for these claims are set forth below.[4]

---

[3]     Citations in the form "CC ¶ __" are to the May 18, 2018 Consolidated Complaint filed in this matter, located at Doc. No. 51.

[4]     The facts and allegations discussed in this motion are drawn from the Complaint, materials cited or referenced therein, and materials of which this Court may take judicial notice. *Tellabs*, 551 U.S. at 322.  Matters subject to judicial notice include the contents of "press coverage, prior lawsuits, . . . regulatory filings," *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008), "[o]fficial government reports and other types of government records," *Paskar* v. *City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014), investor "telephone conference" transcripts, "analysts' reports," *Stevens* v. *InPhonic, Inc.*, 662 F. Supp. 2d 105, 128 n.15 (D.D.C. 2009), and "publicized stock prices," *Ross* v. *Walton*, 668 F. Supp. 2d 32, 41 n.7 (D.D.C. 2009).

1.      _The alleged anticompetitive scheme and the FTC investigation_.

To understand Plaintiff's claims, it is necessary to understand certain pre-class-period events relating to a non-party, Questcor Pharmaceuticals, Inc. ("Questcor"). Questcor was a pharmaceutical company that was acquired by Mallinckrodt in 2014. CC ¶ 20. Questcor's primary product was HP Acthar Gel ("Acthar") — a highly purified preparation of adrenocorticotropic hormone ("ACTH"), which is a naturally occurring hormone secreted by the pituitary gland. CC ¶ 5 & n.1. It is the only ACTH drug approved for use in the United States, and it is used as a treatment for 19 different conditions, including infantile spasms, nephrotic syndrome, multiple sclerosis, and other difficult-to-treat autoimmune and inflammatory conditions. CC ¶¶ 5, 9, 61.

By 2012, Acthar was priced at over $28,000 per vial. CC ¶ 10. Its profitability depended on its market position, which enabled it to set a relatively high price. One of the most significant risks for Questcor investors was erosion of market position, for example, by a new entrant into the market. Ex. 3 (Questcor 2012 10-K) at 6-7, 11-12. Synacthen/Synacthen Depot ("Synacthen"), a synthetic ACTH drug available in Europe (but which had never been determined by the FDA to be safe or effective for sale in the United States) was viewed by some as a potential threat if it could clear FDA hurdles and gain entry in the U.S. market. CC ¶¶ 13-15.

In June 2013 — prior to Mallinckrodt's acquisition and prior to the class period — Questcor purchased from Novartis the U.S. rights to market Synacthen. In doing so, Questcor outbid another company, Retrophin, Inc. ("Retrophin"). CC ¶ 19.

Questcor's purchase of Synacthen was widely publicized and controversial. Numerous market participants — including analysts, short sellers, and journalists — expressed the view that the purchase would have anticompetitive effects and predicted that the transaction would be

subject to FTC scrutiny and potential legal liability. *See infra* pp. 13-16. In line with these reports, Retrophin sued Questcor in January 2014 for antitrust violations, alleging that Questcor was a "monopolist" that had "illegally acquire[d] the rights to Synacthen" in order to "preserve[] and entrench[] its . . . monopoly." Ex. 4 ¶¶ 1, 6, 94; *see also* CC ¶¶ 81, 93. Questcor disclosed and discussed the Retrophin lawsuit in its 2013 Annual Report filed on Form 10-K, filed on February 26, 2014. Ex. 5 at 28.[5]

On April 7, 2014 — well after these events — Mallinckrodt announced it would acquire Questcor. Ex. 6. The transaction was subject to the vote of both companies' shareholders, and Mallinckrodt and Questcor therefore filed with the SEC (as they were required to do) a preliminary joint proxy/prospectus on May 16, 2014 in connection with that vote. Ex. 7. That document incorporated by reference Questcor's 2013 10-K, including the disclosures regarding the Retrophin litigation. Ex. 5 at 28, Ex. 7 at 367.

On June 11, 2014, Questcor received a subpoena from the FTC, seeking documents pertaining to Questcor's purchase of Synacthen. CC ¶ 102. On July 14, 2014, Mallinckrodt and Questcor filed their definitive joint proxy/prospectus with the SEC and mailed it to shareholders. Ex. 8. That document once again incorporated by reference the disclosures regarding the Retrophin litigation, but it was not updated — and was not required to be updated — to include a disclosure of the early-stage FTC investigation.

The transaction closed on August 14, 2014. Following the closing, Mallinckrodt disclosed the FTC investigation in its very next quarterly SEC filing, on November 25, 2014:

> Questcor [had] received a subpoena and Civil Investigative Demand ("CID") from the [FTC] seeking documentary materials and information regarding the

---

[5] Pursuant to Item 103 of Regulation S-K, 17 C.F.R. § 229.103, issuers must disclose "material pending legal proceedings" in their annual reports (filed on Form 10-K), in their quarterly reports (filed on Form 10-Q), and in other required SEC filings.

> FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen Depot from Novartis violate[d] antitrust laws.

CC ¶ 116.  Mallinckrodt continued to disclose the investigation in every subsequent quarterly and annual SEC filing through the resolution of the investigation.[6]  Beginning in August 2015, Mallinckrodt updated its disclosures to report that a number of states had "commenced similar investigations" (Ex. 9 (Mallinckrodt 2015 Q3 10-Q) at 24), and beginning in November 2015, Mallinckrodt also disclosed that it "believe[d]," based on the "information currently available," that "the ultimate resolution" of the FTC investigation "could have a material adverse effect on its financial condition, results of operations and cash flows" (Ex. 10 (Mallinckrodt 2015 10-K) at 118).  These disclosures were repeated each quarter until the matter was resolved in January 2017.[7]  Through November 2016, Mallinckrodt also stated that it was "not aware of any existing or pending litigation in connection with these investigations."  Ex. 16 at 112.

On January 18, 2017, two days before President Trump's inauguration, the FTC filed a complaint accusing *Questcor* of anticompetitive conduct prior to its acquisition by Mallinckrodt.  Ex. 17.  The predicate for the alleged anticompetitive conduct was Questcor's acquisition of Synacthen.  *Id.* at 9-12.  The FTC simultaneously announced a settlement of the matter.  Ex. 18.  The FTC complaint did not allege *any* misconduct by *Mallinckrodt*, which was named only as successor to Questcor.  Under the settlement, Mallinckrodt did not admit any misconduct on Questcor's behalf, but agreed to pay $100 million as Questcor's successor and to license Synacthen to a competitor for certain indications.  CC ¶ 81; Ex. 18 at 8-9, 10-14, 16.

---

[6]     Ex. 11 (2015 Q1 10-Q) at 21; Ex. 12 (2015 Q2 10-Q) at 22; Ex. 9 (2015 Q3 10-Q) at 24; Ex. 10 (2015 10-K) at 118; Ex. 13 (2016 Q1 10-Q) at 20; Ex. 14 (2016 Q2 10-Q) at 23; Ex. 15 (2016 Q3 10-Q) at 24; Ex. 16 (2016 10-K) at 112.

[7]     Ex. 13 (2016 Q1 10-Q) at 20; Ex. 14 (2016 Q2 10-Q) at 23; Ex. 15 (2016 Q3 10-Q) at 24; Ex. 16 (2016 10-K) at 112.

As described *infra* — and notwithstanding Mallinckrodt's many disclosures on the subject over the years — Plaintiff alleges that Mallinckrodt should have disclosed the FTC's early-stage investigation prior to November 2014; should have described the FTC's investigation as "pending litigation" even before a lawsuit was filed; and should have characterized the disclosed facts regarding Synacthen as an "illegal" and "anticompetitive scheme" by Mallinckrodt.

2.  *Trudeau's Medicare estimate*.

On October 6, 2015, Mallinckrodt filed a Form 8-K with the SEC providing an update relating to a recently sold business, and filed a press release providing financial guidance for fiscal year 2016. Ex. 19, Ex. 20. During a public analyst call that day, an analyst asked about Acthar's "exposure to Medicare" — a topic not covered by the filed 8-K or the press release. CC ¶ 128; Ex. 21 (Oct. 6, 2015 call transcript) at 14.

Mark Trudeau began his answer as follows:

> So with regards to your question on Medicare exposure to Acthar, a couple of things. One, if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined *it's about a quarter of our business roughly. Acthar is maybe a little higher than that* . . . .

Ex. 21 at 14 (emphasis added).

Plaintiff alleges this answer provided an estimate for Acthar's reimbursements by Medicare and Medicaid combined. That ignores that the question concerned Medicare only, and that the reference to "Medicare and Medicaid combined" was used for purposes of setting a "rough[]" benchmark ("about a quarter . . . roughly"). Indeed, the remaining three paragraphs of Trudeau's full response — which Plaintiff never quotes — focused almost entirely on Medicare:

> . . . I think the important thing to understand, and maybe what's behind the question is, there have been some discussions publicly about whether or not *Medicare* patients would be exposed to the same type of rebates or discounts that Medicaid patients experience, or that *Medicare* would be negotiating directly, drug prices with the industry. I think, this is a concept that's been discussed many, many times over the last years.

And I think one of the things that it's quite clear that *Medicare* Part D, in particular has been a pretty successful federally funded program. And so, while there have been discussions about changing the *Medicare* Part D, I think typically going back to history and showing the effectiveness of that program has moved people away from that.

If for some reason there was a change to *Medicare* Part D based on the way we interpret it, the types of patients that would likely potentially be eligible for Medicaid type rebates would be those that are in the low subsidy category, or low income subsidy category of *Medicare*. That proportion of patients within our patient population is significantly lower than that overall number of about a quarter of the business that I described. Keep in mind, that a large proportion of our business, certainly in the hospital tends to be *Medicare* Part B, as opposed to *Medicare* Part D. So hopefully, that will give you some perspective on how we see our business mix going forward.

Ex. 21 at 14-15 (emphasis added). The totality of that answer makes clear that Trudeau was discussing Medicare, not Medicare *and* Medicaid.

Plaintiff alleges no follow-up questions on that issue on that call or subsequent calls for the next year. Thirteen months later, however, on November 16, 2016, a firm called Citron Research ("Citron") published a report accusing Mallinckrodt of fraud (the "Citron Report"). CC ¶ 137; Ex. 22 (Citron Report). Purportedly relying on an analysis of both recently published government data and historical Mallinckrodt data, Citron claimed that Trudeau had committed "securities fraud" when he said that Acthar's exposure to Medicare was "maybe a little bit higher" than "about a quarter . . . roughly" because (supposedly) the actual exposure to Medicare *and* Medicaid in 2015 was over 61%. *Id.* at 2-3.

The individual behind Citron, Andrew Left (CC ¶ 25), is a notorious activist short seller. The SEC has stated that short-sellers like Left operate by "first short[ing] a stock and then engag[ing] in a campaign to spread unverified bad news about the stock with the objective of panicking other investors into selling their stock." Ex. 23 (June 5, 2014 SEC report) at 6. Left has been found guilty of making "false and misleading claims" by a Hong Kong judge and has

been barred from trading on Chinese markets for five years.  Ex. 24 (June 8, 2017 N.Y. Times profile of Left); *see also* Ex. 25 (Oct. 22, 2015 Wall St. J. profile of Left).

True to form, Citron's numbers here were wrong.  The very day the Citron Report was published, a number of analysts issued reports observing that Citron used bad math to overstate the percentage of Acthar's revenue attributable to Medicare and Medicaid.  *See infra* pp. 22-24.

Following the Citron Report — and consistent with the analyst reports that debunked Citron's claims — Mallinckrodt disclosed that Trudeau's rough estimate had been essentially correct.  As alleged in the Complaint, on November 17, 2016, Coleman Lannum, a Mallinckrodt executive, explained that Medicare numbers were currently "somewhere in the mid-40s" with "[s]imilar numbers last year," and a "lot lower" in the "mid-30s" "if you go back a couple of years."  CC ¶ 143.  Medicaid exposure, on the other hand, was "probably in the mid-single digit range."  *Id.*  And on November 30, 2016 (and as also alleged in the Complaint), O'Neill provided similar figures, stating, "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."  CC ¶ 151.

In the months after the publication of the Citron Report, the SEC opened an investigation into Mallinckrodt's public statements, filings, and other disclosures regarding Acthar sales, profits, revenue, promotion, and pricing.  Ex. 26 (Mallinckrodt 2017 10-K) at 125.  In February 2018, the SEC notified Mallinckrodt that it had concluded its investigation and that no enforcement action was recommended.  *Id.*

Nevertheless, Plaintiff now claims — based on Citron's bad math — that Trudeau's off-the-cuff "rough" estimate constitutes securities fraud.

3.  *Plaintiff's remaining claims*.

The original *Shenk* complaint, filed in January 2017, primarily addressed the alleged anticompetitive scheme and Trudeau's Medicare statement. Ex. 27 (original *Shenk* complaint). In its Consolidated Complaint, Plaintiff extended the class period and added additional allegations of supposed misstatements relating primarily to insurer restrictions on Acthar, Acthar's efficacy, growth projections for Acthar, and sundry other topics.

For many years, several insurers have imposed restrictions on Acthar, refusing to pay for the drug except under certain circumstances. Those restrictions were publicly disclosed, as were critiques of Acthar's efficacy for certain of its indications. For example, in 2012, Citron published a series of reports questioning the efficacy of Acthar and discussing restrictions on Acthar imposed by Aetna and other insurance companies. Ex. 28 (Sept. 2012 Citron report), Ex. 29 (Oct. 2012 Citron report). The restrictions, as well as issues of Acthar's efficacy, were the subject of five class actions filed in 2012, with a consolidated class action filed in March 2013. Ex. 30. Questcor disclosed and discussed that class action in multiple SEC filings, including its 2013 10-K, and those disclosures were incorporated by reference into the July 2014 Proxy issued by Questcor and Mallinckrodt. Ex. 5 at 27, Ex. 8 at 377.

As described below, Plaintiff rehashes arguments from the 2013 Questcor class action and alleges that, in 2017, Mallinckrodt misled investors by (i) failing to disclose insurers' (public) Acthar restrictions, and (ii) failing to disclose the (again, public) controversy over Acthar's effectiveness. CC ¶¶ 157, 176. Among other claims, Plaintiff also contends that Mallinckrodt's forward-looking projections of "mid-single to low-double digit" growth for Acthar were misleading because the actual numbers came in below the projected numbers. CC ¶¶ 158-73.

**ARGUMENT**

"The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 809-10 (2011).  The Complaint fails to establish (i) a material misrepresentation or omission; (ii) scienter; and (iii) in many cases, economic loss or loss causation.  It should be dismissed.

## I.  PLAINTIFF FAILS TO ALLEGE WITH PARTICULARITY ANY MATERIAL MISSTATEMENTS OR OMISSIONS.

The heightened pleading requirements under Rule 9(b) and the PSLRA are well settled.  A plaintiff "must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'"  *Howard* v. *Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 304 (D.D.C. 2016) (quoting 15 U.S.C. § 78u-4(b)(1)).  The Complaint falls far short of that standard.

### A.  Plaintiff alleges no material misstatements or omissions regarding Acthar's competitive position and business prospects.

Plaintiff's primary claim is that Defendants made materially misleading statements about Mallinckrodt's "competitive position and business plans with respect to Acthar."  CC ¶¶ 99, 100, 110-114.  Notably, Plaintiff does not allege that *any* of Mallinckrodt's statements on this subject were incorrect or inaccurate.  Instead, Plaintiff claims that Mallinckrodt was required to disclose — on top of all of its other disclosures — that Acthar's competitive position and commercial durability were supposedly the result of Mallinckrodt's "monopolistic and anticompetitive actions" to prevent "Synacthen from reaching the U.S. market."  CC ¶¶ 101, 115.

This claim fails as a matter of law on three independent grounds:  (1) as reflected in public documents, the underlying antitrust allegations were already in the public domain,

including from Mallinckrodt's own disclosures; (2) Mallinckrodt was not required to characterize the disclosed facts as anticompetitive or monopolistic conduct; and (3) in any event, Plaintiff has not alleged, and cannot allege, that Mallinckrodt engaged in anticompetitive or monopolistic activity.

1. **Plaintiff has failed to allege any material omissions because all material facts regarding the alleged antitrust issues were disclosed.**

Information is material to the extent it would have been "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 108 (D.C. Cir. 2015). Companies are not required to disclose information that is "widely reported" and already part of the total mix of information. *Pehlivanian* v. *China Gerui Advanced Materials Grp., Ltd.*, 2017 WL 1192888, at *7 (S.D.N.Y. Mar. 29, 2017); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 652 (S.D.N.Y. 2017) ("The Defendants cannot be held liable for failing to disclose publicly available information." (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003))). For good reason: "If the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market will not be misled." *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 181 n.12 (D.D.C. 2007).

The market here was fully aware of the potential antitrust issues surrounding Questcor's acquisition of Synacthen and the implications for Acthar's potential long-term success. When Questcor purchased Synacthen in June 2013, analysts and other public sources widely reported that the deal would protect Acthar from possible competition. Jefferies' report was typical:

> Synacthen/Synacthen Depot have been a key concern among investors as a potential competitive threat to Acthar in the U.S. in indications that are revenue drivers for [Questcor] ([multiple sclerosis], [infantile spasms], [nephrotic syndrome], and rheumatology). We have always maintained that

-13-

> Synacthen/Synacthen Depot would likely need to demonstrate efficacy/safety in clinical trials in the U.S. for those indications, and therefore viewed the likelihood of it being a competitive threat as unlikely. Now that Synacthen's rights are held by [Questcor], a key overhang is removed.

Ex. 31 at 1. Other analyst reports were to the same effect,[8] and, even outside the analyst community, the *New York Times* described the deal as "eliminating the most obvious threat of competition [to Acthar] from a much cheaper drug by acquiring the rights to it." Ex. 32 at 1.

Some commentators went further, suggesting that the transaction may have violated the antitrust laws. The *Times* quoted a former policy director of the FTC who "predicted the deal would receive 'intense scrutiny' by federal antitrust regulators." *Id.* On August 1, 2013, Senator Amy Klobuchar wrote a letter to the FTC calling for an investigation into Questcor's acquisition of Synacthen,[9] and in November 2013, Citron surfaced to claim that the FTC had opened an investigation into Questcor and speculated that Questcor executives might be criminally prosecuted. Ex. 37 (Nov. 2013 Citron Report) at 1-2, 4; Ex. 38 (Sen. Klobuchar letter).

These issues were publicized not only in press reports, analyst reports, public calls for investigation, and short-seller reports; they were also the subject of public litigation. In January 2014, Retrophin sued Questcor, alleging that Questcor was a "monopolist" that had "illegally acquire[d] the rights to Synacthen" in order to "preserve[] and entrench[]" its "monopoly." Ex. 4

---

[8]    *See, e.g.*, Ex. 33 (Oppenheimer) at 2 ("There had been fears that another company could attempt to bring Synacthen to the U.S. . . . and compete with Acthar. With Questcor now in the process of obtaining Synacthen rights, this important overhang appears to be resolved."); Ex. 34 (Piper Jaffray) at 1 ("Even if [Questcor] essentially sits on the asset, it is a logical move to the extent that it removes the threat (however remote) that a brand competitor could emerge."); Ex. 35 (Ladenburg Thalmann) at 1 ("[W]e believe the transactions mostly (not completely) remove an overhang from the possibility of franchise erosion due to future competition from Synacthen formulations."); Ex. 36 (Janney Capital Markets) at 1 ("With this acquisition, th[e] potential threat [of competition by Synacthen] has been absorbed and eliminated.").

[9]    The letter was published online by Citron in December 2013. Ex. 39 at 3.

¶¶ 1, 6, 94; *see also* CC ¶ 93.  The litigation sought declaratory judgments, financial damages, and injunctive relief.  Ex. 4 at pp. 19-20.

The Retrophin litigation — a civil action making the same claims as the subsequent FTC action — was disclosed by Questcor in its 2013 10-K on February 26, 2014:  "In January 2014, Retrophin Inc. filed a lawsuit against us . . . alleging a variety of federal and state antitrust violations based on our acquisition from Novartis of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen."  Ex. 5 at 28.[10]

The July 2014 Proxy incorporated by reference Questcor's 2013 10-K, including disclosures relating to the Retrophin litigation.  Ex. 5 at 28, Ex. 8 at 377.  After Mallinckrodt's acquisition of Questcor closed in August 2014, Mallinckrodt continued to disclose the Retrophin litigation and also disclosed the FTC investigation in *every* quarterly filing, beginning with the 10-K filed on November 25, 2014.  CC ¶ 116.  In later periods, as the investigation continued, Mallinckrodt further disclosed that:

> While it is not possible at this time to determine with certainty the ultimate outcome of this matter, the Company believes, given the information currently available, that the ultimate resolution, after taking into account amounts already accrued, could have a *material adverse effect on its financial condition, results of operations and cash flows*.

Ex. 10 (2015 10-K) at 118 (emphasis added); Ex. 16 (2016 10-K) at 112 (emphasis added).

Thus, during the class period, the market had the following information:

- Questcor had purchased Synacthen, thereby "remov[ing] the threat (however remote) that a brand competitor could emerge" (Ex. 34 (Piper Jaffray report) at 1);

- In 2013, Senator Klobuchar had called for an FTC investigation of Questcor and Citron had reported that the FTC had opened such an investigation;

---

[10]     Following the acquisition of Questcor, Mallinckrodt settled the Retrophin litigation for $15.5 million.  CC ¶ 94 & n.16.

- In 2014, Retrophin had sued Questcor, accusing it of anticompetitive conduct and seeking declaratory, monetary, and injunctive relief; and

- By November 2014, in its very first quarterly SEC filing after acquiring Questcor, Mallinckrodt disclosed the FTC investigation in its 10-K, including, in later years, that the investigation could have a material impact on the company.

Against this backdrop, there is no plausible claim that Mallinckrodt omitted material information regarding potential antitrust risk to Acthar's competitive position and future business prospects. The market was fully informed on this subject, including by Mallinckrodt. *See Ieradi* v. *Mylan Labs., Inc.*, 230 F.3d 594, 598-99 (3d Cir. 2000) (company did not need to disclose that its "success was primarily possible because of [allegedly anticompetitive] contracts"; omission was immaterial because disclosure of the FTC investigation was "sufficient to put potential investors . . . on notice" of "alleged anticompetitive activity" and risk of "antitrust action by the FTC").

### 2. Mallinckrodt was not required to use Plaintiff's preferred pejorative language or accuse itself of criminality.

Notwithstanding these comprehensive disclosures, Plaintiff claims that Mallinckrodt nevertheless committed securities fraud by omitting to affirmatively characterize its conduct as "illegal" and "anticompetitive." CC ¶ 177. But courts have uniformly recognized that such "self-flagellation" is not required. Where, as here, the underlying facts are known to the public, "pejorative characterizations" such as the ones Plaintiff seeks "are immaterial as a matter of law." *Kowal* v. *MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994).

As this Circuit explained in *Kowal*, "the use of a particular pejorative adjective will not alter the total mix of information available to the investing public." *Id.* at 1277. The relevant question for materiality is not how a company *describes* facts, but whether the market has "accurate hard data from which analysts and investors can draw their own conclusions." *In re XM*, 479 F. Supp. 2d at 181. As a result, "once a company discloses material objective factual

matters, it need not characterize or editorialize on those facts in any particular way." *In re MGT Capital Invs., Inc. Sec. Litig.*, 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018).

That is particularly true where the pejorative characterization is an admission of illegal conduct. In *City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), for example, the plaintiffs argued "that, in addition to disclosing the existence of an investigation, defendants were required to disclose that UBS was, in fact, engaged in an ongoing tax evasion scheme." The Second Circuit rejected that argument:

> As we have explained, disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing. By disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS to substantial monetary damages and legal defense costs, as well as injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions, UBS complied with its disclosure obligations under our case law.

*Id.*

Given Mallinckrodt's own disclosures and the public information from other sources, "the relevant facts were disclosed and were clearly available." *Phelps* v. *Stomber*, 883 F. Supp. 2d 188, 214 (D.D.C. 2012). The alleged "failure to describe" those facts "in the negative terms plaintiffs use in their complaint does not constitute an actionable material omission." *In re XM*, 479 F. Supp. 2d at 181. Even assuming an anticompetitive scheme existed (and it did not), any failure to disclose that scheme was immaterial.

### 3. Plaintiff has failed to allege any "anticompetitive scheme."

In any event, there was no "anticompetitive scheme" by Mallinckrodt to disclose. As several courts have explained, "where plaintiff's central allegation is that defendants' statements and omissions during the Class Period were misleading because, on information and belief, they failed to disclose an underlying antitrust conspiracy, *plaintiff must plead with particularity the facts that establish the existence of the antitrust conspiracy*." *Hogan* v. *Pilgrim's Pride Corp.*,

2018 WL 1316979, at *5 (D. Colo. Mar. 14, 2018) (emphasis added); *see also Gamm* v. *Sanderson Farms, Inc.*, 2018 WL 1319157, at *3 (S.D.N.Y. Jan. 19, 2018) ("Where the plaintiffs' underlying allegation in a Rule 10b-5 case is that a defendant participated in an antitrust conspiracy, the plaintiffs must plead the facts of the alleged conspiracy with particularity."). Plaintiff has not met that burden.

Plaintiff alleges that Mallinckrodt engaged in anticompetitive conduct following its Questcor acquisition. Specifically, it alleges that Mallinckrodt failed to develop Synacthen to treat any conditions already treated by Acthar and thereby sought to preserve an alleged Acthar monopoly. CC ¶ 20; *see also id.* ¶¶ 84-87. But that allegation — which provides the sole basis for Plaintiff's claim of anticompetitive conduct — fails to state any antitrust violation. It is black-letter law that a company is not required to compete with itself: anticompetitive conduct requires either (a) coordinated conduct among *multiple parties* to restrain trade or (b) unilateral conduct to exclude *competitors*.[11] Plaintiff nowhere alleges that Mallinckrodt coordinated with anyone or engaged in any conduct to exclude competitors.[12] Notably, even the FTC never accused *Mallinckrodt* of any anticompetitive activity — the FTC complaint only challenged conduct that predated Mallinckrodt's acquisition of Questcor. Ex. 17 (FTC complaint) at 9. Given that there are no factual allegations plausibly suggesting that Mallinckrodt engaged in any

---

[11]     *See Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Section 1 of the Sherman Act . . . reaches unreasonable restraints of trade effected by a 'contract, combination . . . or conspiracy' between *separate* entities. It does not reach conduct that is 'wholly unilateral.'" (emphasis in original)); *Am. Tobacco Co.* v. *United States*, 328 U.S. 781, 809 (1946) (Section 2 of the Sherman Act, which reaches unilateral conduct, requires "intent and purpose" to "exclude competitors"); *see also United States* v. *Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("A firm violates [Section 2 of the Sherman Act] only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in *exclusionary conduct* . . . ." (emphasis added)).

[12]     The original *Shenk* complaint alleged that Mallinckrodt had failed to disclose "*Questcor's* illegal anticompetitive conduct." Ex. 27 ¶ 33 (emphasis added). Plaintiff apparently abandoned that claim in the Consolidated Complaint, basing its Complaint only on inadequate allegations of "*Mallinckrodt's* anticompetitive practices." CC ¶ 115 (emphasis added).

anticompetitive scheme, Plaintiff cannot argue that the failure to disclose the existence of such a

nonexistent scheme rendered any statements misleading.[13]

### B. The Complaint alleges no material misstatements or omissions regarding the FTC investigation.

#### 1. The July 2014 Proxy.

Plaintiff acknowledges that Mallinckrodt disclosed the existence of the FTC investigation

in every quarterly SEC filing after it acquired Questcor in August 2014.  CC ¶ 116.  Plaintiff

nevertheless claims that Mallinckrodt fraudulently omitted this investigation from the July 2014

Proxy soliciting shareholder approval of the deal in *July* 2014 — *i.e.*, before it even owned

Questcor.  CC ¶ 102.  This claim fails for three separate reasons.

*First*, the law is clear that "a government investigation, without more, does not trigger a

generalized duty to disclose."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12

(S.D.N.Y. 2016); *see also Markman* v. *Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *8 (W.D.

Tex. Aug. 19, 2016) ("the existence of an investigation, standing alone, does not automatically

give rise to . . . a duty" to disclose); *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261,

272, 274 (S.D.N.Y. 2012) (no duty to disclose notice that the SEC Enforcement Staff has decided

to recommend charges to the Commission).  Plaintiff has not alleged any reason why Mallinckrodt

was required, as a matter of law, to disclose an early stage FTC investigation into Questcor, or why

---

[13]      Even if the FTC had accused Mallinckrodt of misconduct, neither the FTC complaint nor the FTC settlement could satisfy Plaintiff's pleading burden under the PSLRA, since administrative settlements without admissions of liability are "not the result of an actual adjudication of any of the issues" and "can not be used as evidence in subsequent litigation between that corporation and another party to prove liability."  *Waterford Twp. Police & Fire Ret. Sys.* v. *Smithtown Bancorp., Inc.*, 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014). Indeed, pursuant to Fed. R. Civ. P. 12(f), courts frequently strike as immaterial allegations that reference such settlements.  *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) (citing cases).

omission of the investigation rendered the proxy "so incomplete as to mislead." *City of Roseville Emps.' Ret. Sys.* v. *Nokia Corp.*, 2011 WL 7158548, at *8 (S.D.N.Y. Sept. 6, 2011).

*Second*, the market was fully informed of the potential antitrust issues around Synacthen, as well as the risk of an FTC investigation, rendering any omission immaterial. That awareness came from media and analyst reports, Retrophin's Sherman Act lawsuit against Questcor, Senator Klobuchar's letter calling for an FTC investigation (Ex. 38), and the 2013 report by Citron that the FTC *had* opened an investigation (Ex. 37 at 2). Indeed, the Retrophin litigation — raising the very same underlying issues as the FTC investigation — was disclosed in Questcor's 2013 10-K, which was incorporated by reference in the July 2014 Proxy. Ex. 5 at 28, Ex. 8 at 377.

*Third*, the Complaint does not allege that the market had a negative reaction to the news of the FTC investigation when it was disclosed in November 2014 in Mallinckrodt's 2014 10-K. That lack of market reaction defeats any claim of materiality. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."). *See also infra* pp. 44-45 (addressing loss causation).

### 2. The absence of "pending" FTC litigation.

Plaintiff also claims that Mallinckrodt lied when it stated in November 2016 that it was "not aware of any existing or pending litigation in connection with" the FTC investigation. CC ¶¶ 118-126. Plaintiff alleges that Mallinckrodt had to know that an FTC complaint was forthcoming, and that the *impending* complaint was a "*pending* litigation." CC ¶ 126. That theory is baffling — as numerous courts have held, litigation is not "pending" until "*after it is commenced by either filing a complaint with the court or by the service of a summons.*" *Swartz* v. *Meyers*, 204

F.3d 417, 421 (3d Cir. 2000) (emphasis added) (quoting *Black's Law Dictionary* (6th ed., 1990)).[14]

Since (as Plaintiff acknowledges) the FTC's complaint was not filed until January 18, 2017 (CC ¶ 31), there can be no argument that the litigation was "pending" prior to that date.

## C.  The Complaint lacks adequate allegations that Trudeau's statement about Acthar's Medicare exposure was materially false or misleading.

During an analyst call in October 2015, Mark Trudeau was asked, "[W]hat is your Acthar exposure to Medicare?" Trudeau responded that it was "maybe a little higher than" the company's overall "proportion of our business that goes through Medicare and Medicaid combined" of "about a quarter . . . roughly." Ex. 21 at 14.  Contrary to Plaintiff's claim, this broad "rough" estimate was not wrong, let alone materially false.  CC ¶¶ 128-129.

Under the PSLRA, plaintiffs "must do more than say that the statement[] [was] false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  To meet that burden, a plaintiff cannot rely on a "conclusory allegation that the opposite of a statement is true." *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004).  Rather, a plaintiff "must detail specific . . . data or information" that is "inconsistent with the representation in question." *In re Merrill Lynch Tyco Research Sec. Litig.*, 2004 WL 305809, at *4 (S.D.N.Y. Feb. 18, 2004).

---

[14]     *See also Currie* v. *Matesanz*, 281 F.3d 261, 266 (1st Cir. 2002) ("The common understanding is that an action or suit is 'pending' from its inception until the rendition of final judgment."); *Williams* v. *Coyle*, 167 F.3d 1036, 1038 (6th Cir. 1999) ("In ordinary usage a case is pending when a complaint or petition is filed."); *Diaz* v. *Shallbetter*, 984 F.2d 850, 856 (7th Cir. 1993) ("plain meaning" is that "an action or suit is 'pending' from its inception until the rendition of final judgment"); *McDonald* v. *Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 897 F.2d 1510, 1514 n.4 (9th Cir. 1990) ("ordinary understanding" of "pending" is "Began, but not yet completed"); *Downs* v. *Dir., Office of Workers Comp. Programs, U.S. Dep't of Labor*, 803 F.2d 193, 198 n.9 (5th Cir. 1986) (same).

Plaintiff points to two sources of data that allegedly contradict Trudeau's statement:

1.  The Citron Report, which claimed that Acthar's exposure to Medicare and Medicaid in 2015 was over 61% (CC ¶¶ 137-141); and

2.  November 2016 statements by Mallinckrodt executives about Acthar's exposure to Medicare and Medicaid (CC ¶¶ 143, 151).

Neither of these can carry the weight Plaintiff assigns it.

1.  *The Citron Report.* The Citron Report's claim that 61% of Acthar's 2015 revenue came from Medicare and Medicaid — which the Complaint parrots — is demonstrably wrong. It relies on bad math and mischaracterized data — as the analyst community promptly pointed out, *see infra* pp. 22-24. According to Citron, the 61% figure is equal to the approximately $650 million spent by Medicare and Medicaid on Acthar in 2015, divided by the total 2015 Acthar revenue disclosed in Mallinckrodt's SEC filings — approximately $1.06 billion. CC ¶¶ 133-37; Ex. 40. But as the source documents referenced in the Complaint make clear,[15] that is an apples-to-oranges comparison: the $650 million figure is *gross* Medicare and Medicaid spending, while the $1.06 billion is *net* revenue. A comparison between those figures shows precisely nothing.

To explain, Citron purported to base its calculations on data provided by the Center for Medicare and Medicaid Studies ("CMS") in its 2015 Medicare and Medicaid "dashboards." Ex. 40. As the dashboards themselves made clear, the figures reflected in its data set are gross payments that did not account for "rebates or other price concessions." Exs. 41, 42 (Medicare and Medicaid dashboard descriptions). These rebates and price concessions are (often substantial) payments by manufacturers (such as Mallinckrodt) to federal and state Medicaid

---

[15]    *See, e.g.*, *Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference."); *Kaempe* v. *Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").

programs or Medicare Part D plans.[16]  Thus, as the dashboards acknowledged, the $650 million

figure significantly overstated the amount Mallinckrodt actually received in revenue for Acthar

because that figure did not account for the rebates Mallinckrodt paid back to Medicaid and

Medicare providers.

On the other hand, the denominator in Citron's equation — the total 2015 Acthar revenue

disclosed by Mallinckrodt — *did* account for rebates.  As Mallinckrodt explained in its 2015

10-K, "When the Company recognizes net sales, it simultaneously records an adjustment to

revenue for estimated chargebacks, *rebates*, product returns and other sales deductions."  Ex. 10

at 78 (emphasis added).  As a result, it is not possible to meaningfully compare the CMS figures

and the total Acthar revenues.  To the contrary, by using an inflated numerator (gross sales),

Citron — a short seller looking to profit by driving down Mallinckrodt's stock price — was

guaranteed to find exactly what it wanted:  an inflated estimate for Acthar's Medicare and

Medicaid revenues that Citron could use to create the false impression of a corporate fraud.

Citron's bad math was called out at the time by market observers.  The analyst reports

issued in response to the Citron Report — whose reactions should "be taken into account in

determining whether [an alleged misstatement] could, as a matter of law, be determined to be

immaterial," *In re XM*, 479 F. Supp. 2d at 182 (quoting *Grossman* v. *Novell, Inc*., 120 F.3d 1112,

1124 (10th Cir. 1997)) — uniformly observed that Citron's 61% figure was not supported by the

data.  For example:

---

[16]      Under Medicaid, the rebates are determined by a complicated formula with the *minimum* rebate for drugs like Acthar set by statute at 23 percent of gross spending.  *See* 42 U.S.C. § 1396r-8(c)(1)(B)(i)(VI); *see generally Texas* v. *Caremark Rx, Inc.*, 2013 WL 12202702, at *3 (W.D. Tex. Jan. 2, 2013) (describing statutory Medicaid-rebate formula).  For Medicare, the average rebate across *all* drugs in 2015 was 18.2 percent, but that average includes the approximately 87 percent of drugs that are generic and typically offer *no* rebates.  Ex. 43 (2017 Medicare Trustee report) at 143 & n.66.

- "The dashboards exclude any data on manufacturer rebates or pricing concessions, so we believe that Citron is starting with highly inflated assumptions of cost to the system that may not reflect actual dollars received by Mallinckrodt." Ex. 44 (Nov. 16, 2016 Mizuho report) at 1.

- "The [Citron] report . . . appears to overstate Acthar CMS sales as a percent of total product sales, as the methodology utilized by CMS drug spending dashboard for Medicare spend is based on gross sales, not net." Ex. 45 (Nov. 16, 2016 Leerink report) at 1 (estimating actual current percentage as "closer to 38-45%").[17]

- "It is important to note that the CMS data does not reflect rebates or other price concessions, making a comparison with reported sales problematic (*i.e.*, net sales related to Medicare and Medicaid was likely less than 61% of reported sales)." Ex. 46 (Nov. 16, 2016 Deutsche Bank report) at 1.

- "We note that dashboard data does not account for rebates or other discounts and comparing this to [Mallinckrodt's] reported sales may be 'apples-to-oranges.'" Ex. 47 (Nov. 17, 2017 Bank of America Merrill Lynch report) at 7.

The Citron Report therefore is not "specific . . . data or information" that is "inconsistent with the representation in question." *In re Merrill Lynch*, 2004 WL 305809, at *4. It was merely false information provided by a short seller — previously convicted of making false claims — to mislead the market and to tank Mallinckrodt's stock in order to earn himself a profit. The Court should disregard it entirely.

2. *The statements by Mallinckrodt executives*. Plaintiff also attempts to establish the alleged falsity of Trudeau's estimates by relying on November 2016 statements by Mallinckrodt executives about Acthar's exposure to Medicare and Medicaid. But those statements are consistent with Trudeau's estimates.

---

[17] Notably, the Leerink report criticizing the Citron Report was written by the same analyst who asked the original question about Acthar's Medicare exposure on the October 6, 2015 call. *Compare* Ex. 21 (call transcript) at 14 (question by Jason Gerberry), *with* Ex. 45 (report by Jason Gerberry). The report went on to rate Mallinckrodt stock as "Outperform" and gave it a "Buy" recommendation. Ex. 45 at 1, 3.

On November 17, 2016, Coleman Lannum, a Mallinckrodt executive, was asked about Acthar's exposure to Medicare and Medicaid. CC ¶¶ 142-143. Lannum explained that at that time, Acthar's Medicare exposure was "somewhere in the mid-40s" with "[s]imilar numbers last year," and a "lot lower" in the "mid-30s" before that. CC ¶ 143. In each of those years, Medicaid numbers had been in the "mid-single digit[s]." *Id.* Later that month, Defendant O'Neill provided similar figures. CC ¶ 151. O'Neill explained, "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for [Acthar] versus where it was a year and a half, two years ago which was more in that low, mid-30s." CC ¶ 151.

Which brings us back to Trudeau's comment. As noted, on a 2015 analyst call — scheduled to cover other subjects — Trudeau was asked about Acthar's Medicare exposure that year, and he responded that it was "maybe a little higher than" "about a quarter . . . roughly." Ex. 21 at 14. Plaintiff alleges at several points that Trudeau's estimate was "25% or maybe a little higher." CC ¶¶ 29, 144, 145, 149. That allegation is clearly incorrect. Trudeau's response, by its terms, made clear that he was offering, at best, a rough estimate of the general range of exposure — he did not have a precise number. And the boundaries of that range are difficult, if not impossible, to parse: it is greater than, not equal to, 25%, and there is no clear upper limit.

Plaintiff ignores that inherent uncertainty, preferring to treat Trudeau's estimate as equivalent to 25%. But that is not how reasonable investors — or courts — analyze statements, particularly oral statements. As the Supreme Court has explained, reasonable investors consider the "context" in which a statement is made and understand that "off-the-cuff" estimates like Trudeau's statement will not have the precision of "formal documents filed with the SEC." *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015). Here, reasonable investors would understand that Trudeau's on-the-spot estimate of

"maybe a little higher than" "about a quarter . . . roughly" was not a statement of an exact number, but rather a broad and indefinite range. *See id.* (reasonable investors consider "surrounding text," including "hedges" and "disclaimers"); *see also In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *12 (N.D. Ind. May 23, 2018) ("no reasonable investor" would expect an "imprecise, not definite" estimate in an "off-the-cuff statement" in an "unscripted portion of an earnings call" "to be dead on"). While Plaintiff may ignore that context and Trudeau's use of qualifiers such as "about," "roughly," and "maybe," reasonable investors do not, and this Court should not.

Given the context and Trudeau's qualifying language, his response to an unscripted question was certainly within a reasonable range of Lannum and O'Neill's estimates. *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (finding no misstatement as a matter of law where company stated third-quarter revenue would be "approximately equal" to second-quarter revenue when third-quarter revenue was actually 10% lower; actual results were "pretty much" as predicted).

In any event, even if the Court were to construe "maybe a little higher than" "about a quarter . . . roughly" as conveying something potentially lower than Lannum's and O'Neill's estimates, that difference would be immaterial and therefore not actionable. At the time Trudeau provided his rough estimate, total Acthar revenues represented only 31% of Mallinckrodt's overall revenues. Ex. 10 (Mallinckrodt 2015 10-K) at 129; *see also* CC ¶ 181. Thus, any hypothetical gap between Trudeau's estimate and Lannum's and O'Neill's estimate would correspond to only a small percentage of overall Mallinckrodt revenues. To illustrate, a 10% differential on Acthar revenues exposed to Medicare would only implicate 3.1% of Mallinckrodt's total revenue (*i.e.*, 31% of 10%). Courts and the SEC have recognized that even a *misstatement* of revenue by less

than 5% is unlikely to be material.[18]  Here, of course, there are no allegations of any misstatement of revenue — Plaintiff alleges only that the Medicare revenues had some unspecified degree of increased risk.  Thus, any possible effects on revenue (if any) from this alleged elevated risk profile would at most be negligible and would not "significantly alter[] the 'total mix' of information made available."  *In re Harman*, 791 F.3d at 108.

Further, Plaintiff has not alleged any facts suggesting that a higher percentage of Acthar's revenue coming from Medicare would be material to investors, no matter the size of the gap.  Revenue that does not come from Medicare primarily comes from private insurers — the same private insurers that investors knew (and Plaintiff specifically alleges) had been imposing restrictions on Acthar for years.  CC ¶¶ 163-166.  As Plaintiff acknowledges, Mallinckrodt disclosed that increasing government payments could be a risk (CC ¶ 127), and Plaintiff offers no explanation for why, given the similar alleged risks associated with private insurer restrictions, investors would equate higher Medicare exposure with greater risk than the alternative.

3.    *The estimate addressed Medicare, not Medicaid.*  Plaintiff also alleges that Trudeau's estimate covered both Medicare and Medicaid — allegedly amplifying by a few percentage points the supposed dissonance between his response and Lannum's and O'Neill's later statements.  CC ¶¶ 22, 24, 129.

But that reading is implausible.  As explained *supra* at pp. 8-9, Trudeau was responding to a question solely about Medicare ("[W]hat is your Acthar exposure to Medicare?"), and his

---

[18]     *See ECA & Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) ("[T]he five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement."); SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151 (Aug. 19, 1999) ("The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that — without considering all relevant circumstances — a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material.").

full four-paragraph response — which Plaintiff never quotes — focused entirely on Medicare, with only a passing reference to the company's overall Medicare and Medicaid exposure as a baseline for Acthar's Medicare exposure.

Even if the Court accepts Plaintiff's theory that Trudeau was addressing Acthar's combined exposure to *both* Medicare and Medicaid, the result is still the same. According to Lannum, Acthar's exposure to Medicaid in 2015 was only in the "mid-single digit[s]." CC ¶ 143. Plaintiff offers no allegations to suggest that reasonable investors would see a *material* difference between Trudeau's highly qualified estimate of "maybe a little higher than" "about a quarter . . . roughly" and Lannum's "very loose" estimates for Medicare and Medicaid combined (CC ¶ 144), especially when considered in the context of Mallinckrodt's total revenue.

Plaintiff has failed to allege facts showing that Trudeau's estimate was materially false or misleading. Under the PSLRA, any claims based on that estimate must be dismissed.

**D.** **The other alleged misstatements in the Complaint are also not false or misleading, and are immaterial or otherwise nonactionable.**

Finally, the Complaint alleges a grab bag of additional supposed misstatements. These kitchen-sink theories should all be rejected.

1.  *Insurer restrictions.* Plaintiff claims that several statements were supposedly misleading because they omitted information about insurer restrictions on Acthar. CC ¶¶ 157, 163, 167, 171-73. That claim ignores that such restrictions were well known to the market.

Glaringly, the evidence Plaintiff cites to show the allegedly concealed insurer restrictions are all taken from insurers' publicly available websites. CC ¶¶ 163-166 nn.30-37. The alleged omission of such publicly known information cannot be a material misstatement. *See In re XM*, 479 F. Supp. 2d at 181 n.12 ("If the market has become aware of the allegedly concealed

information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market will not be misled.").

The market had long been aware of these insurer restrictions, even before the class period began, including from disclosures by Questcor in its 2013 10-K, which was incorporated by reference in the July 2014 Proxy issued by Questcor and Mallinckrodt. Ex. 5 (Questcor 2013 10-K) at 6 ("All third party payers are sensitive to the cost of drugs, have taken efforts to control those costs, and presumably will continue to do so in the future. Acthar will likely continue to be subject to payer-driven restrictions."). And, as noted, they were a frequent topic of analyst and other public commentary for many years.[19]

Indeed, Mallinckrodt disclosed these insurer restrictions on several occasions (as Plaintiff recognizes), including in SEC filings and statements by Trudeau. *See, e.g.*, Ex. 10 (2015 10-K) at 27-29 (disclosing risk posed by payer reimbursement levels); Ex. 16 (2016 10-K) at 26-28 (same). For example, on August 4, 2015, Trudeau "highlighted the fact that the Company was facing a great deal of pressure from health insurance companies and other payers over the cost of Acthar and warned that a string of consolidation in the health insurance industry could make the situation even more difficult." CC ¶¶ 171, 202. And on February 17, 2017, Trudeau reminded investors that "a number of payers . . . had made some restrictions to their formularies." *Id.* ¶ 156. A few months later, on May 8, 2017, he noted that the company was making progress

---

[19]     For example, in 2012, Citron published a series of reports discussing restrictions on Acthar imposed by Aetna and other insurance companies. Ex. 28 (Sept. 2012 Citron report), Ex. 29 (Oct. 2012 Citron report). Similarly, analyst reports published before the class period frequently described the restrictions various insurers had imposed and their impact on Acthar. *See, e.g.*, Ex. 48 (May 2014 UBS report explaining restrictions on Acthar by Aetna, Tricare, Humana, UnitedHealth Group, and Cigna). These issues were also the subject of the class actions filed against Questcor in 2012 and 2013. Ex. 30.

with "a number of payers," but was only having success in getting restrictions removed in "some cases." Ex. 49 at 7.

To the extent that the Complaint focuses on statements by Trudeau regarding "good progress" and "strengthen[ing ] . . . positions," they are immaterial as a matter of law. Such vague statements of corporate optimism are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *In re Harman*, 791 F.3d at 109; *see also Venable LLP* v. *Overseas Lease Grp., Inc.*, 2015 WL 4555372, at *4 (D.D.C. July 28, 2015) ("[G]eneralized statements of optimism that are not capable of objective verification are puffery, not actionable misrepresentations."). And, in any event, the Complaint fails to allege any facts to support an inference that these statements were false.

Similarly misplaced are Plaintiff's challenges to statements that "the majority of payers have an established pathway for the use of Acthar in patients for whom it is appropriately prescribed for conditions covered by the FDA-approved label" and that Mallinckrodt had "increased percentages of commercial lives under contract" and "gained greater access to insurance coverage for private managed care." CC ¶¶ 163-167. Plaintiff offers no factual allegations that these statements were not true. As the Second Circuit has explained, plaintiffs "must do more than say that the statement[] [was] false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund*, 750 F.3d at 236.

2.     *Projections of future growth.* Plaintiff next challenges Mallinckrodt's and Trudeau's forward-looking projections and guidance for Acthar's future sales growth on the basis that the actual numbers ultimately came in below the projected numbers. CC ¶¶ 153-56, 161, 163, 171-72, 189. But the law is clear: "Securities fraud claims may not be based on 'fraud

by hindsight' — in other words, there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." *In re XM*, 479 F. Supp. 2d at 176. Such claims are routinely dismissed because "[t]he fact that [a] company's performance did not conform to that predicted supports no inference that [the] statements lacked a reasonable basis when made." *Kowal*, 16 F.3d at 1278.

In addition, all of the challenged growth projections were forward-looking statements shielded from liability by the PSLRA's safe harbor provision. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). Under that provision, there is no liability for a forward-looking statement if "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ." *In re XM*, 479 F. Supp. 2d at 177. For oral statements, such as those at issue here, that standard is satisfied if it "is accompanied by" statements that "the particular oral statement is a forward-looking statement," that "the actual results might differ materially from those projected" and that identify written documents containing identifying additional risk factors. 15 U.S.C. § 78u-5(c)(2).

That is inarguably the case here. Before each oral statement, the company advised that investors would hear "forward-looking statements" and that "actual results could be materially different," and referred listeners to "the cautionary statements contained in our SEC filings for a more detailed explanation of the inherent limitations of such forward-looking statements."[20] Those SEC filings listed pages and pages of risk factors, "any one of which could cause [its]

---

[20]     Ex. 50 (Aug. 4, 2015 call) at 3 (cited in CC ¶ 171); *accord* Ex. 51 (Jan. 19, 2017 call) at 3 (cited in CC ¶ 153); Ex. 52 (Feb. 7, 2017 call) at 3 (cited in CC ¶ 156); Ex. 49 (May 8, 2017 call) at 3 (cited in CC ¶ 157); Ex. 53 (Aug. 8, 2017 call) at 3 (cited in CC ¶ 161).

actual results to vary materially from recent results or from our anticipated future result." Ex. 16 (2016 10-K) at 22; Ex. 10 (2015 10-K) at 23; Ex. 54 (2014 10-K) at 24. Relevant here, Mallinckrodt consistently disclosed that its "ability to maintain and increase net sales from [products such as Acthar] depends on several factors, including . . . [its] ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payers." Ex. 16 at 26; Ex. 10 at 27; Ex. 54 at 27-28.

Plaintiff's hindsight allegation that Acthar failed to perform as projected thus fails to state a claim of fraud, and those growth projections — identified as forward-looking and accompanied by risk disclosures — are precisely what the PSLRA's safe harbor was designed to protect.

3. *Acthar's efficacy.* Plaintiff alleges that statements such as "Acthar's efficacy in its approved indications was strongly supported by evidence" were false because "while Acthar has been found to be effective for infantile spasms and to treat relapses of multiple sclerosis, the remainder of studies . . . are of low quality, consisting primarily of case series, small uncontrolled single-arm studies, and several observational health care utilizations." CC ¶ 162.

This claim distorts Mallinckrodt's actual statement. That statement — which the Complaint does not provide — said, "H.P. Acthar Gel's efficacy in its approved indications is strongly supported by evidence. The U.S. Food and Drug Administration (FDA) reviewed the label in 2010, and determined there in fact was sufficient scientific and clinical evidence to support the 19 indications now in the current label." Ex. 55 at 1. Plaintiff, of course, does not (and could not) allege that the FDA did not conduct such a review or find sufficient evidence for Acthar's efficacy in its approved indications.

To the extent Plaintiff claims that the statement was misleading because it omitted to disclose that the studies relied upon by the FDA were allegedly "low quality" because they were

"uncontrolled single-arm studies" (CC ¶ 162), virtually *identical* weaknesses were already fully disclosed to the market by Mallinckrodt itself.  In its 2015 and 2016 10-Ks, Mallinckrodt disclosed that the "evidence of efficacy [for Acthar] is based on physician's clinical experience with Acthar and *does not include clinical trials*" (except for the two indications — multiple sclerosis and infantile spasms — for which Plaintiff acknowledges Acthar had been proven effective in clinical studies).  Ex. 16 at 28 (emphasis added); Ex. 10 at 29 (emphasis added).  And the same critiques were also raised previously in Citron's 2012 accusations and the 2012 lawsuits against Questcor, which specifically alleged that Acthar's efficacy was not supported by "multiple-phase, randomized double-blind clinical trials."  Ex. 30 ¶ 36.  Once again, the public was informed of the very information Plaintiff alleges was omitted, defeating Plaintiff's claims.[21]

4.    *Proportion of sales from neurology.*  In one of the Complaint's more bizarre claims, Plaintiff alleges that Trudeau made a material misstatement on an investor call in 2016 when he stated that Acthar had been "predominantly a neurology business [in 2014] and now it's starting to evolve much more into a pulmonology and rheumatology business."  CC ¶ 148.  According to Plaintiff, this 2016 statement misrepresented the historical state of affairs in *2014* — rather than being "predominantly a neurology business" in 2014, Acthar allegedly had "approximately the same" revenues for "Neurology, Nephrology, and Rheumatology."  *Id.*

This claim is mystifying.  *First*, Plaintiff's "proof" that this statement was false is a chart from a *2014* public investor presentation.  *Id.*  Given that the market had all of the same information in 2014 that Plaintiff relies on now, it is unclear how anyone could have been misled.  *Second*, Plaintiff acknowledges that Trudeau went on to give the accurate 2014 ratios of neurology to other indications on the very same investor call.  CC ¶ 149.  *Third*, Plaintiff nowhere alleges that

---

[21]    Plaintiff also fails to allege any corrective disclosures within the class period or loss causation for this claim.  *See infra* pp. 44-45 (addressing loss causation).

there was any corrective disclosure of this supposed misstatement, any market reaction to any corrective disclosure, or any reason why this description of 2014 historical fact would be material to anyone in 2016. *See infra* pp. 44-45 (addressing loss causation).

5. *European manufacturer of Synacthen.* Plaintiff claims that Mallinckrodt was required to disclose in the July 2014 Proxy that in "the spring of 2014 the existing European manufacturer of [Synacthen] announced it would cease manufacturing the product in April 2016 — requiring Mallinckrodt to identify and initiate production with a new manufacturer." CC ¶ 109. But Plaintiff does not adequately allege that this omission would have been material to reasonable investors — indeed, the Complaint does not even allege that Mallinckrodt's stock price fell in response to this news. *See In re Burlington Coat Factory*, 114 F.3d at 1425 (Alito, J.) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."); *see also infra* pp. 44-45 (addressing loss causation).[22]

6. *Acthar's proportion of the company's "business."* The Complaint alleges that on an appearance of the CNBC television program *Fast Money*, on March 15, 2016, Trudeau falsely claimed that "Acthar represents less than a third of [Mallinckrodt's] business." CC ¶ 179 (alteration in original). According to Plaintiff, this statement contradicts another Trudeau statement, eight months later, on November 29, 2016, that Acthar "represents a significant greater proportion of our *operating income* than a third." CC ¶ 181. This claim is nothing more than semantics. "Business" does not necessarily mean "operating income" — it is often used, and in this case was used, to mean sales or revenue. In fact, Plaintiff recognizes as much: Plaintiff specifically alleges that when Trudeau estimated that Medicare and Medicaid accounted

---

[22] This allegation also undermines Plaintiff's theory that Mallinckrodt acted with any anticompetitive intent — but for Mallinckrodt's investment in Synacthen, the drug apparently would have been off the market by 2016 and could not have competed with Acthar in any event.

for "about a quarter of our *business*, roughly," he meant about a quarter of "sales," not operating income. CC ¶¶ 128-29. And Plaintiff also specifically acknowledges that "Acthar's reported revenues" were "about one-third of the Company's total reported revenues." CC ¶ 181.

Further, to the extent the term "business" was ambiguous — be it revenues, operating income, or something else — a term with multiple potential meanings is not materially misleading merely because a plaintiff can drum up one possible meaning after the fact that could render the statement false. To the precise contrary, the existence of ambiguity renders any potential misstatement immaterial. *See Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (rejecting claim based on statement that contracting slowdown was only "temporary"; "'Temporary' is an indeterminate term: it could mean weeks, it could mean months, it could mean years"; thus, it was "not clear from the complaint that there was a misstatement at all, much less a material one").[23]

## II. PLAINTIFF FAILS TO ALLEGE PARTICULARIZED FACTS RAISING A STRONG INFERENCE OF SCIENTER.

Under the PSLRA, a plaintiff must plead with particularity "scienter" — "an intent to deceive, manipulate, or defraud." *Lorenzo* v. *SEC*, 872 F.3d 578, 582-83 (D.C. Cir. 2017). That standard requires sufficient allegations that the speaker either knowingly misled investors or acted with "extreme recklessness" — meaning that the speaker was "aware of [the danger of misleading investors] and consciously disregarded it." *Id*. at 583. That showing must be made as to "each defendant," *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & ERISA Litig.* ("*In re*

---

[23] Further, Plaintiff's suggestion (CC ¶ 115) that the statement that Acthar has "limited direct competition" is false because Trudeau stated in 2018 (outside the class period) that Acthar "has competition on every single one of its indications today" is meritless. There are many drugs that treat the same diseases as Acthar, all of which compete with Acthar, but there are no other ACTH drugs available in the United States to "direct[ly]" compete with Acthar. *See* CC ¶ 5 (Acthar is "the only therapeutic ACTH drug licensed by the FDA."); *see also infra* pp. 44-45 (addressing loss causation).

*Fannie Mae I*"), 503 F. Supp. 2d 25, 40 (D.D.C. 2007), and in the case of a corporate defendant, it must be made as to "someone whose intent could be imputed to the corporation," *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

Under the PSLRA, unlike the normal rule, allegations that raise a "plausible" or "reasonable" inference of scienter are inadequate.  *Tellabs*, 551 U.S. at 314.  Instead, a plaintiff must raise a "strong inference" of scienter, which is "powerful," "cogent," "compelling," and "thus strong in light of other explanations."  *Id.* at 323, 324.  For this reason, in securities fraud cases, courts *must do* what they normally *may not do* on a motion to dismiss — weigh "competing inferences rationally drawn from the facts alleged," *id.* at 314, and allow the claim to proceed "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *id.* at 324.

To meet these requirements, courts in this district require allegations that (1) "show that defendants had both motive and opportunity to commit fraud," or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Stevens*, 662 F. Supp. 2d at 115; *see also Emps.' Ret. Sys. of Gov't of the Virgin Islands* v. *Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (same).  The Complaint fails to satisfy either prong.

### A.    Plaintiff does not allege any motive by Defendants to commit fraud.

The "'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  *ECA & Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Less personalized motives "that are common to most corporate officers" do not suffice.  *Id.*; *see also Stevens*, 662 F. Supp. 2d at 123 (rejecting "motive" of increasing bonus payments because it could "create an inference of scienter against any corporate officer").  Thus, for example, "the desire for

the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[] do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198.

Plaintiff has not alleged *any* suspicious stock sales by the Individual Defendants or any other plausible motive by any person whose intent could be attributed to Mallinckrodt. That alone "weighs against" any inference of scienter. *Plumbers Local #200 Pension Fund* v. *Wash. Post Co.*, 930 F. Supp. 2d 222, 227 (D.D.C. 2013). Moreover, as shown through SEC filings of which this Court can take judicial notice, Trudeau *increased* his stock holdings by acquiring approximately 130,000 shares over the class period (about a 100% increase); Harbaugh *increased* his holdings by acquiring approximately 45,000 shares (about a 150% increase); and O'Neill *increased* his holdings by acquiring approximately 25,000 shares (about a 450% increase). [24] *See* Exs. 56, 57 (Trudeau Form 4s); Exs. 58, 59 (Harbaugh Form 4s); Exs. 60, 61 (O'Neill Form 4s). Those acquisitions further undermine any possible motive to commit fraud and cut against a finding of scienter. *See, e.g.*, *Fire & Police Pension Ass'n of Colo.* v. *Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) (the fact that an executive "*increased* his holdings of [the company's] stock . . . negates any inference that he had a motive to artificially inflate [the company's] stock during that period" (emphasis in original)); *Turner* v. *MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (stock purchases during class period "rebut[] an inference of scienter"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) ("net acquisition of shares cuts against" scienter).

---

[24] This information is contained in the Form 4s filed with the SEC by Trudeau, Harbaugh, and O'Neill, which are required filings that disclose all purchases or sales of issuer's shares by directors or officers. *See* 17 C.F.R. § 240.16a-3. Courts may take judicial notice of officers' holdings and transactions as disclosed in their Form 4s. *See In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 582-83 (S.D.N.Y. 2011) (citing cases).

### B. Plaintiff does not allege strong circumstantial evidence of conscious misbehavior or recklessness.

Plaintiff's failure to allege any motive is "noteworthy." *Plumbers Local #200*, 930 F. Supp. 2d at 227. Absent motive, the strength of other allegations of scienter "must be correspondingly greater." *ECA*, 553 F.3d at 199; *see also Rand-Heart of New York, Inc.* v. *Dolan*, 812 F.3d 1172, 1177 (8th Cir. 2016) ("without a showing of motive or opportunity, other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA's] standard"). Far from meeting that even higher bar, Plaintiff has failed to allege *any* facts suggesting anyone knowingly misled investors or consciously disregarded the danger of misleading investors.

Instead, Plaintiff alleges in a conclusory fashion that the Individual Defendants knew about the supposed misstatements, pointing to their "positions with the Company" and "access to material non-public information." CC ¶¶ 56, 115, 210. But those are precisely the kind of fact-free allegations that the PSLRA precludes and that courts routinely reject. *See Plumbers Local #200*, 930 F. Supp. 2d at 230 ("Allegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate." (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999))).

This total absence of particularized facts is especially striking in light of the "rigorous pleading standard" in fraud cases, which "courts have recognized" is necessary to "discourage[] meritless fraud accusations, prevent[] serious damage to the reputation of the defending party from baseless claims, and deter[] claimants from adding broad fraud allegations to induce advantageous settlements." *Capitol Justice, LLC* v. *Wachovia Corp.*, 2008 WL 11388566, at *4 (D.D.C. June 11, 2008). It is no small matter to accuse the executives of a major corporation of fraud, and it is inexcusable to do so without any concrete allegations of intent. *See Color Sys.,*

*Inc.* v. *Meteor Photo Reprographic Sys., Inc.*, 1987 WL 11085, at *9 (D.D.C. May 8, 1987) ("fraud is a serious allegation, casting aspersions on the character of the accused, and therefore ought not to be indulged without a proper foundation in fact"); *see also U.S. ex rel. Polansky* v. *Pfizer, Inc.*, 2009 WL 1456582, at *9 (E.D.N.Y. May 22, 2009) ("it is a serious matter to accuse a person or company of committing fraud, and the mere accusation often causes harm").

Further, Plaintiff's repeated suggestions that Defendants had scienter because they themselves were the speakers of certain allegedly false statements misunderstands the analysis. CC ¶¶ 56, 210, 212, 213, 215, 216. "A false statement is one element of a securities fraud claim; scienter is a wholly separate element." *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006). Even if Plaintiff has adequately alleged any false statements (and it has not), such allegations cannot raise any inference of scienter, let alone a strong one.

In addition to these facially inadequate generalized allegations of scienter, Plaintiff also makes equally deficient scienter allegations on the specific topics of the alleged fraud.

### 1. The alleged anticompetitive scheme.

The Complaint is entirely devoid of any factual allegations of scienter regarding non-disclosure of an alleged anticompetitive scheme. Without particularized facts showing what each Defendant knew and when, Plaintiff cannot meet its high burden.

The claim that Trudeau knew of the "scheme" to delay development of Synacthen is supported solely by speculation by one anonymous former employee that certain decisions "would have" been made by Trudeau. CC ¶ 91. But "a vague assertion that a defendant must have known about the fraud by virtue [of] a position of authority does not result in a strong inference of scienter." *Ross* v. *Walton*, 668 F. Supp. 2d 32, 40 (D.D.C. 2009); *see also In re Comput. Sci. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 663-64 (E.D. Va. 2012) (allegation by former employee that information "would have been sent" to officer is too speculative to plead scienter).

Equally inadequate are the allegations that the Individual Defendants were aware of the alleged anticompetitive scheme because they were members of Mallinckrodt's "management executive committee," which supposedly made decisions about the development of Synacthen. CC ¶¶ 92, 211, 214-216. "[T]he D.C. Circuit provides clear guidance on how to view information gained from participation in committees." *Plumbers Local No. 200 Pension Fund* v. *Wash. Post Co.*, 831 F. Supp. 2d 291, 298-99 (D.D.C. 2011). Absent allegations of "what [the defendant] learned, from whom he learned it, and how he responded to it . . . [committee] participation does not supply a strong inference of scienter." *Id.* at 299. The Complaint contains no such details.[25]

In any event, any inference of scienter would be less compelling than inferences of nonculpable conduct and thus would fail to meet the high standard required by the PSLRA. *See Tellabs*, 551 U.S. at 325. Mallinckrodt repeatedly disclosed the Retrophin litigation and the FTC investigation, including that the FTC investigation may have a material adverse effect on the company. "It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures." *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013). And, as noted above, the Individual Defendants collectively acquired 200,000 Mallinckrodt shares over the course of the class period, at allegedly inflated prices. *See In re Fed. Nat'l Mortg. Ass'n Sec., Derivative & ERISA Litig.* ("*In re Fannie Mae II*"), 892 F. Supp. 2d 59, 74 (D.D.C. 2012) ("To say the least, such [purchases] are inconsistent with a fraudulent intent."). That course of conduct

---

[25] Similarly flawed are Plaintiff's claims that Mallinckrodt knew of the investigation into Questcor in July 2014. CC ¶¶ 103-104. Rather than providing particularized facts as the PSLRA requires, those allegations are impermissibly based on speculation and a chain of possible inferences. *Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017) ("[a] plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard"; rather, a "strong inference of scienter [must] be supported by facts, not other inferences").

suggests that the only plausible inference is the nonculpable inference that Defendants believed they had nothing to hide and acted accordingly. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013) (dismissing clam for failure to plead scienter, because "the market's access to [allegedly omitted] information . . . supports a compelling inference that any failure to disclose occurred because the defendants reasonably believed that no further disclosure was required"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

## 2. Trudeau's Medicare estimate.

Plaintiff similarly fails to allege any inference of scienter regarding Trudeau's estimate of Acthar's Medicare exposure. Plaintiff alleges only that, as a general practice, the "Company's management team was provided with up-to-date information concerning its sales of Acthar." CC ¶ 212. But that generalized allegation includes no particularized facts and is utterly inadequate as a matter of law. *See Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *Stevens*, 662 F. Supp. 2d at 120-21 ("[A] generalized assertion that the defendants' corporate positions exposed them to 'confidential' information about [the company] is insufficient to warrant an inference of scienter in the absence of details regarding what this information entailed, when the defendants received it, or how it related to the alleged fraud.").

Plaintiff also utterly fails to grapple with the overwhelmingly strong inference of non-fraudulent intent. *See Tellabs*, 551 U.S. at 324 (dismissal required unless "inference of scienter" is "at least as compelling as any opposing inference one could draw from the facts alleged"). Trudeau's statement was in the context of a live conference call, where he had to provide an on-the-spot response to an unscripted question without the ability to review his answer for clarity. As the Seventh Circuit has explained, there is no inference of scienter where a defendant "did not

know what question was coming, had to answer off the cuff, and did not have an opportunity to review the question and edit his answer before the next question was posed." *Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012); *see also In re Supreme Indus.*, 2018 WL 2364931, at *12 (no strong inference of scienter where "off-the-cuff statement was made in an unscripted portion of an earnings call in response to a question that the Defendants were not told in advance"). That is precisely the situation here.

The full text of Trudeau's response (quoted *supra* at pp. 8-9) confirms the complete absence of any reasonable inference of scienter. Far from holding himself out as especially "knowledgeable," about "Acthar's percentages of reimbursement," as Plaintiff contends (CC ¶ 211), when asked, "[W]hat is your Acthar exposure to Medicare?", Trudeau provided an admittedly "rough" estimate hedged with expressions of uncertainty — "maybe a little bit higher" than "about a quarter . . . roughly" (*id.* ¶ 128). Trudeau then went on in three additional paragraphs to explain why he did not expect major changes in Medicare payments going forward. Ex. 21 at 14-15. There is nothing in that lengthy answer suggestive of deceitful intent — it is the words of a CEO attempting to be responsive to an analyst's unscripted question.

And even if Trudeau's estimate was imprecise, or even if it was unclear whether he was addressing Medicare only or both Medicare and Medicaid, that ambiguity does not provide a strong inference of scienter. *See Cozzarelli* v. *Inspire Pharm.*, 549 F.3d 618, 627 (4th Cir. 2008) ("inference of imprecise or even negligent use of language" does not support "an inference of scienter"); *see also Merck & Co., Inc.* v. *Reynolds*, 559 U.S. 633, 649 (2010) (a plaintiff must show "that a defendant made a material misstatement *with an intent to deceive* — not merely innocently or negligently" (emphasis in original)).

Further, Trudeau never repeated the supposed misstatement, which was never included in any Mallinckrodt public filing. And to the extent he misspoke at all, the materiality of the misstatement was "marginal" at most (*see supra* pp. 24-28), both of which "tend[] to undercut the argument that [Trudeau] acted with the requisite intent." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Waters Corp.*, 632 F.3d 751, 757-58 (1st Cir. 2011) (marginal materiality undercuts scienter); *see also In re Anadarko Petrol. Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 835 (S.D. Tex. 2013) (that statement was "an isolated occurrence, not repeated by" the speaker or anyone else, "weigh[s] against the inference of scienter").

Put another way, to avoid dismissal, Plaintiff's claim requires this Court to draw the following inferences:

1.      In the moments between hearing the question and giving his answer, Trudeau made the decision to use an unscripted question about Acthar's exposure to Medicare to deceive investors about Acthar's exposure to Medicare *and* Medicaid;

2.      Trudeau implemented that fraudulent intent by *under*stating Acthar's exposure to Medicare and Medicaid, thereby *over*stating its exposure to the private insurers who were aggressively and publicly imposing restrictions on Acthar (as Trudeau had warned the market a few months earlier, CC ¶¶ 171, 202);

3.      Having chosen to go down the road of committing fraud, Trudeau nevertheless gave a vague, qualified approximation that was, even on plaintiff's reading, still within range of accurate;

4.      Once the fraud was in motion, Trudeau never repeated the misstatement again or otherwise tried to advance the fraudulent scheme; and

5.      Trudeau followed up on the fraud by acquiring tens of thousands of shares at what he would have known was an inflated price.

There is no world in which such a lengthy chain of implausible inferences could be called "strong." Plaintiff has failed to allege facts sufficient to create a strong inference that Trudeau

acted with scienter.  This claim should be dismissed.[26]

### 3.      Plaintiff's remaining allegations.

There is little to say about the scienter allegations for Plaintiff's remaining assortment of claims, *see supra* pp. 28-35, because Plaintiff has simply failed to provide any.  Putting aside the conclusory allegations sprinkled throughout the Complaint, Plaintiff does not allege even a single particularized fact suggesting that any individual at Mallinckrodt had knowledge beyond what the public knew — that insurers had placed restrictions on Acthar for years and that some people had criticized the studies demonstrating Acthar's effectiveness.  CC ¶ 213.  This total failure to allege scienter requires dismissal of these claims.

## III.   THE COMPLAINT FAILS TO ALLEGE LOSS CAUSATION FOR SEVERAL OF THE ALLEGED MISSTATEMENTS.

Loss causation is an essential element of a securities fraud claim.  *See Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005).  To satisfy that element, "a complaint must allege that the Company's share price fell significantly after the truth became known."  *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011); *see also Freeland* v. *Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 80 (D.D.C. 2008) ("A plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.").

For the following alleged misstatements, Plaintiff does not even attempt to allege any drop in the stock price in connection with a corrective disclosure:

---

[26]      The implausibility of any claim of scienter is emphasized by the SEC's decision not to pursue an enforcement action following its investigation (Ex. 26 at 125) — a publicly disclosed fact that Plaintiff chose to omit from the Complaint.

- The alleged omission of the existence of the FTC investigation from the July 2014 Proxy (CC ¶ 102), which investigation was disclosed on November 25, 2014 with no alleged drop in price (CC ¶ 116).

- The alleged omission of the fact that the European manufacturer of Synacthen would cease manufacturing the product in April 2016, which was disclosed on November 17, 2015 with no alleged drop in price. CC ¶¶ 106, 109.

- The alleged misstatement in *2016* that Acthar had been predominantly a neurology business in *2014*, which was allegedly contradicted by documents that had been publicly available since 2014, with no alleged corrective disclosure or any corresponding drop in price. CC ¶ 148.

- The alleged misstatements regarding Acthar's efficacy (CC ¶¶ 159, 176), which were allegedly corrected by a JAMA reply published in April 2018 (well outside the class period), with no alleged drop in price (CC ¶ 162). *See* Ex. 62 (Apr. 2018 JAMA reply).

- The alleged misrepresentation regarding whether Acthar has "limited direct competition," which was allegedly corrected by a statement in 2018 (outside the class period), with no alleged drop in price. CC ¶ 115.

Without any allegations of loss causation, any claims based on these alleged

misstatements must be dismissed. *See Dura*, 544 U.S. at 346.

## CONCLUSION

For the foregoing reasons, Mallinckrodt respectfully requests that its motion to dismiss

the Consolidated Complaint with prejudice be granted.

Dated: July 17, 2018

Respectfully submitted,

VENABLE LLP

WACHTELL, LIPTON, ROSEN & KATZ
Rachelle Silverberg (*pro hac vice*)
Jonathan Siegel (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
Phone: (212) 403-1000
Fax: (212) 403-2000
RSilverberg@wlrk.com
JRSiegel@wlrk.com

By: /s/ Moxila A. Upadhyaya
     Moxila A. Upadhyaya

Moxila A. Upadhyaya (D.C. Bar No. 494373)
600 Massachusetts Ave., NW
Washington, D.C. 20001
Phone: (202) 344-4690
Fax: (202) 344-8300
MAUpadhyaya@venable.com

*Attorneys for Mallinckrodt plc*